## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Case No. 07CV4612 (GBD)

———————————————

DR. MORGAN REYNOLDS
on behalf of the UNITED STATES OF AMERICA,
Plaintiff/Relator,

v.

SCIENCE APPLICATIONS INTERNATIONAL CORP.; APPLIED RESEARCH
ASSOCIATES INC.; BOEING; NuSTATS; COMPUTER AIDED ENGINEERING
ASSOCIATES, INC.; DATASOURCE, INC.; GEOSTAATS, INC.; GILSANZ
MURRAY STEFICEK LLP; HUGHES ASSOCIATES, INC.; AJMAL ABBASI;
EDUARDO KAUSEL; DAVID PARKS; DAVIS SHARP; DANIELE
VENEZANO; JOSEF VAN DYCK; KASPAR WILLIAM; ROLF JENSEN &
ASSOCIATES, INC.; ROSENWASSER/GROSSMAN CONSULTING
ENGINEERS, P.C.; SIMPSON GUMPERTZ & HEGER, INC.; S.K. GHOSH
ASSOCIATES, INC.; SKIDMORE, OWINGS & MERRILL, LLP; TENG &
ASSOCIATES, INC.; UNDERWRITERS LABORATORIES, INC.; WISS,
JANNEY, ELSTNER ASSOCIATES, INC.; AMERICAN AIRLINES;
SILVERSTEIN PROPERTIES; and UNITED AIRLINES,
Defendants.

———————————————

**Defendants Simpson, Gumpertz & Heger, Inc. and
Computer Aided Engineering Associates, Inc.'s
Memorandum of Law In Support of Motion to Dismiss
Pursuant to Fed. R. Civ. P. 9(b), 12(b)(1), 12(b)(6) and 12(h)(3)**

———————————————

Respectfully submitted,

David M. Pollack (DP6143)
DONOVAN HATEM LLP
One Penn Plaza
250 W. 34th Street, Suite 3324
New York, NY 10119
(212) 244-3333

David J. Hatem, P.C.
William D. Gillis, Jr., Esq.
Patricia B. Gary, Esq.
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500

*Attorneys for Defendants,
Simpson Gumpertz & Heger, Inc. and
Computer Aided Engineering Associates, Inc.*

# TABLE OF CONTENTS.

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... ii

I.     PRELIMINARY STATEMENT ................................................................... 1

II.    INTRODUCTION ......................................................................................... 1

III.   FACTUAL BACKGROUND ....................................................................... 3

      A.    Facts Alleged In The *Qui tam* Complaint .................................... 3

      B.    Facts Alleged In Dr. Reynolds' March 8, 2007
          Request for Clarification ................................................................. 6

      C.    Facts Alleged In Dr. Reynolds' May 1, 2007
          Supplemental RFC ........................................................................... 7

IV.   ARGUMENT ................................................................................................ 8

      A.    The Complaint Should Be Dismissed Because The
          District Court Lacks Subject Matter Jurisdiction ......................... 8

      B.    The Complaint Should Be Dismissed Because It
          Fails to Plead Fraud With Particularity Under Rule 9(b) .............. 16

      C.    The Complaint Should Be Dismissed Because The
          Information Quality Act ("IQA") Provides An Exclusive
          Administrative Process For Challenging The Quality Of
          Information Disseminated By Federal Agencies ........................... 20

      D.    The Complaint Should Be Dismissed Because
          Reynolds Lacks Standing To Bring The Common
          Law Causes of Action ...................................................................... 22

      E.    The Court Should Award Attorney's Fees To
          Defendants SGH and CAE ............................................................. 23

V.     CONCLUSION ............................................................................................ 25

# TABLE OF AUTHORITIES CITED.

**Cases**

Americans For Safe Access v. U.S. Dep't of Health & Human Serv.,
   2007 U.S. Dist. Lexis 55597 (N.D. Cal. 2007) ........................................................22

APWU v. Potter, 343 F.3d 619 (2d Cir. 2003).......................................................8

Aurechione v. Schoolman Transp. Sys., Inc., 426 F.3d 635 (2d Cir. 2005) ........................8

Bly-Magee v. California, 236 F.3d 1014 (9th Cir. 2001)................................................17

Carlson v. Principal Fin.Group, 320 F.3d 301 (2d Cir. 2003) ..............................................8

Decker v. Massey-Ferguson, Ltd., 681 F.2d 111 (2d Cir. 1982) ........................................19

Eisenstein v. Whitman, 4 Fed. Appx. 24 (2d Cir. 2001) ....................................................18

Gold v. Morrison-Knudson Co., 68 F.3d 1475 (2d Cir. 1995)..............................14, 17, 18

Harrison v. Westinghouse Savannah River Co., 176 F.3d 776 (4th Cir. 1999) .................17

In re Operation of the Missouri River Sys. Litig., 363 F. Supp. 2d 1145
   (D. Minn. 2004), *vacated in part and aff'd in part on other grounds*,
   421 F.3d 618 (8th Cir. 2005)........................................................................................22

Madonna v. U.S., 878 F.2d 62 (2d Cir. 1989)...................................................................19

Mills v. Polar Molecular Corp., 12 F.3d 1170 (2d Cir. 1993).........................................18

Rockwell Int'l Corp. v. United States, 127 S. Ct. 1397, 167 L. Ed. 190 (2007)............9, 13

Salt Instit. v. Leavitt, 440 F.3d 156 (4th Cir. 2006) ....................................................20, 22

Salt Instit. v. Thompson, 345 F. Supp. 2d 589 (E.D. Va. 2004) .......................................20

United States ex rel. Alcohol Found., Inc. v. Kalmanovitz Charitable
   Found., Inc., 186 F. Supp. 2d 458 (S.D.N.Y. 2002)........................................8, 14, 15, 16

United States ex rel. Alcohol Found., Inc. v. Kalmanovitz Charitable
   Found., Inc., 53 Fed. Appx. 153 (2d Cir. 2002).............................................8, 14, 15, 16

TABLE OF AUTHORITIES CITED.

United States ex rel. Anti-Discrimination Center v. Westchester County,
    2007 U.S. Dist. Lexis 50589 (S.D.N.Y. 2007).........................................................................8, 12

United States ex rel. Bain v. Georgia Gulf Corp., 208 Fed. Appx. 280 (5th Cir. 2006)....................23

United States ex rel. Beattie, 2001 U.S. Dist. Lexis 26185 (M.D.Fla. 2001) ....................................23

United States ex rel. Clausen v. Lab Corp. of Am., Inc., 290 F.3d 1301 (11th Cir. 2002),
    cert. denied, 537 U.S. 1105, 154 L. Ed. 2d 774, 123 S. Ct. 870 (2003)........................................17

United States ex rel. Dick v. Long Island Lighting Co., 912 F.2d 13 (2d Cir. 1990) ......................11

United States ex rel. Doe v. John Doe Corp., 960 F.2d 318 (2d Cir. 1992)................................10, 13

United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220 (1st Cir. 2004).........17, 18

United States ex rel. Kreindler & Kreindler v. United Techs. Corp.,
    985 F.2d 1148 (2d Cir. 1993).............................................................................................12, 13, 15

United States ex rel. LaCorte v. SmithKline Beechan Clinical Labs, Inc.,
    149 F.3d 227 (3rd Cir. 1998).........................................................................................................17

United States ex rel. Mikes v. Straus, 274 F. 3d 687 (2d Cir. 2001) ................................................24

United States ex rel. Phipps v. Comprehensive Cmty. Dev. Corp., 152 F. Supp. 2d 443
    (S.D.N.Y. 2001) ...........................................................................................................................22

United States ex rel. Rockefeller, 274 F. Supp. 2d 10 (D.D.C. 2003) ..............................................23

United States ex rel. Sarafoglou v. Weill Med.College, 451 F. Supp. 2d 613
    (S.D.N.Y. 2006) ...........................................................................................................................18

United States ex rel. Smith v. New York Presbyterian Hosp., 2007 U.S. Dist. Lexis 53826
    (S.D.N.Y. 2007) ...............................................................................................................17, 18, 19

United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,
    944 F.2d 1149 (3d Cir. 1991).........................................................................................................15

TABLE OF AUTHORITIES CITED.

United States ex rel. Thompson v. Columbia/HCA Heathcare Corp., 125 F.3d 899
(5th Cir. 1997)...........................................................................................................17

United States ex rel. Totten v. Bombadier Corp., 351 U.S. App. D.C. 30, 286 F.3d 542
(D.C. Cir. 2002)........................................................................................................17

United States v. Baylor Univ. Med. Center, 469 F.3d 263 (2d Cir. 2006)...................9, n.4

United States v. Eastman Kodak Co., 98 F. Supp. 2d 141 (D. Mass. 2000).....................23

United States v. New York Med.College, 252 F.3d 118 (2d Cir. 2001)...........................16

United States v. Space Hunters, Inc., 429 F.3d 416 (2d Cir. 2005) ...................................8

United States v. United Techs. Corp., 255 F. Supp. 2d 779 (S.D. Ohio 2003)................23

Walburn v. Lockheed Martin Corp., 431 F.3d 966 (6th Cir. 2005) ...................................9

Yuhasz v. Brush Wellman, Inc., 341 F.3d 559 (6th Cir. 2003)........................................17

**Statutes**

15 U.S.C.S. § 7301 ...........................................................................................................3

31 U.S.C. § 3729 ...............................................................................................................9

31 U.S.C. § 3729(a)(1) ..........................................................................................1, 16, 19

31 U.S.C. § 3729(a)(2) ..........................................................................................1, 16, 19

31 U.S.C. § 3729(a)(7) ..........................................................................................1, 16, 19

31 U.S.C. §§ 3729-33 .......................................................................................................1

31 U.S.C. § 3730(a) ..........................................................................................................9

31 U.S.C. § 3730(b)(1).......................................................................................................9

31 U.S.C. § 3730(b)(2).......................................................................................................9

TABLE OF AUTHORITIES CITED.

31 U.S.C. § 3730(b)(4)(B) ...................................................................................9

31 U.S.C. § 3730(d)(4) ...................................................................................1, 23, 24

31 U.S.C. §§ 3730(e)(4)(A) ...................................................................................passim

31 U.S.C. §§ 3730(e)(4)(B)...................................................................................passim

44 U.S.C. § 3516 note ...................................................................................20

Pub. L. No. 106-554, § 1(a)(3) [Title V, § 515] (Dec. 21, 2000)...................................20

**Federal Rules of Civil Procedure**

Rule 9(b)...................................................................................passim

Rule 12(b)(1) ...................................................................................passim

Rule 12(b)(6) ...................................................................................passim

Rule 12(h)(3) ...................................................................................passim

**Federal Regulations**

67 Fed. Reg. 8452 ...................................................................................20

67 Fed. Reg. 8458-59 ...................................................................................21

**Federal Agency Guidelines**

National Institute Of Standards And Technology Guidelines, Information Quality Standards, And
    Administrative Mechanism, http://www.nist.gov/director/quality standards.htm ......................21

**Other Authorities**

John T. Boese, Civil False Claims and Qui Tam Actions § 5.04 (2d ed. 2000 & Supp. 2003).........17

## I.    PRELIMINARY STATEMENT

Pursuant to Local Rule 7.1, Fed. R. Civ. P. 9(b), 12(b)(1), 12(b)(6) and 12(h)(3), the

defendants, Simpson Gumpertz & Heger, Inc. ("SGH") and Computer Aided Engineering

Associates, Inc. ("CAE") submit the following Memorandum of Law in Support of their Motion to

Dismiss.  As set forth below, this Court should dismiss the *qui tam* Complaint filed by Dr. Morgan

Reynolds ("Reynolds") because the Court lacks subject matter jurisdiction, the Complaint fails to

plead fraud with the particularity required by Rule 9(b), and fails to state a claim upon which relief

can be granted.  Additionally, defendants should be awarded their legal fees and costs under 31

U.S.C. § 3730(d)(4).  Defendants incorporate by reference their Notice of Motion and Affirmation

of David M. Pollack, filed herewith.

## II.    INTRODUCTION

On May 30, 2007, the relator in this case, Dr. Morgan Reynolds ("Reynolds") commenced

this *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729-33, by filing a complaint under

seal against twenty-six defendants,[1] (the "Complaint") including Simpson Gumpertz & Heger, Inc.

("SGH") and Computer Aided Engineering Associates, Inc. ("CAE").  The Complaint alleges seven

causes of action against all defendants, as follows:  (1) False Claims Act, 31 U.S.C. § 3729(a)(1)

(Presentation of False Claims); (2) False Claims Act, 31 U.S.C. § 3729(a)(2) (Making or Using

False Record or Statement); (3) False Claims Act, 31 U.S.C. § 3729(a)(7) (Reverse False Claims);

(4) Unjust Enrichment; (5) Payment by Mistake; (6) Recoupment of Overpayments; (7) Common

Law Fraud.  On  July 11, 2007, pursuant to 31 U.S.C. § 3730, the Office of the Attorney General for

---

[1] The defendants are as follows:  (1) Science Applications International Corp.; (2) Applied Research Associates, Inc.; (3) NuStats; (4) Computer Aided Engineering Associates, Inc.; (5) Datasource, Inc.; (6) Geostaats, Inc.; (7) Gilsanz Murray Steficek LLP; (8) Hughes Associates, Inc.; (9) Ajmal Abbasi; (10) Eduardo Kausel; (11) David Parks; (12) David Sharp; (13) Daniele Venezano; (14) Josef Van Dyck; (15) Kaspar William; (16) Rolf Jensen & Associates, Inc.; (17) Rosenwasser/Grossman Consulting Engineers, P.C.; (18) Simpson Gumpertz & Heger, Inc.; (19) S.K. Ghosh Associates, Inc.; (20) Skidmore, Owings & Merrill, LLP; (21) Teng & Associates, Inc.; (22) Underwriters Laboratories, Inc.; (23) Wiss, Janney, Elstner Associates, Inc.; (24) American Airlines; (25) Silverstein Properties; and (26) United Airlines.

the United States of America (the "Government") notified the Court of its decision not to intervene, <u>see</u> Order, dated July 6, 2007 (Gerard E. Lynch, U.S.D.J.), and the Complaint was unsealed.

Defendants SGH and CAE have moved to dismiss this *qui tam* action pursuant to Fed. R. Civ. P. 9(b), 12(b)(1), 12(b)(6) and 12(h)(3).  Specifically, Reynolds' FCA claims should be dismissed pursuant to Rules 12(b)(1) and (h)(3) for lack of subject matter jurisdiction under the FCA's Original Source Rule, 31 U.S.C. § 3730(e)(4)(A), because Reynolds has provided no factual basis in his Complaint to support the FCA statutory requirement  that he must be the original source of the information forming the basis for his FCA claims.  Additionally, Reynolds' Complaint should be dismissed under Rule 12(b)(6) because he has failed to provide sufficient detail about his theory of FCA liability, or about any specific fraudulent claim, and has therefore failed to provide the requisite particularity under the heightened pleading standard of Rule 9(b), which applies to suits under the FCA.  Although Dr. Reynolds' Complaint provides a rough sketch of his theory of FCA fraud, and alleges improper billing in a conclusory manner, he has failed to identify even a single specific instance of the defendants SGH or CAE submitting a fraudulent bill to the government, and therefore the Complaint lacks the detail and specificity required by Rule 9(b).  Additionally, Dr. Reynolds' FCA claims should be dismissed under Rule 12(b)(1) and (h)(3) because they are based upon the same information which is presently pending before the National Institute of Standards and Technology, in the form of a Request for Correction ("RFC"), and Reynolds has failed to exhaust the administrative process established by NIST for challenging the quality of information disseminated by that federal agency. Finally, Reynolds' common law claims should be dismissed because a relator in a *qui tam* action lacks standing to assert common law claims based upon an alleged injury sustained by the United States.

### III.    FACTUAL BACKGROUND

#### A.    Facts Alleged In The *Qui tam* Complaint

Dr. Reynolds' allegations revolve primarily around a report issued by the National Institute of Standards and Technology ("NIST"), an agency of the United States Department of Commerce. NIST was authorized under the National Construction Safety Team Act ("NCST"), 15 U.S.C.S. § 7301, to investigate the destruction of the World Trade Center complex ("WTC").  Complaint, ¶ 3.  Reynolds alleges that NIST had a budget of sixteen million ($16,000,000) and contracted with each of the twenty-six defendants to assist in the investigation of what caused the destruction of the Twin Towers of the WTC ("WTC 1, 2").  Id.  On October 26, 2005, NIST issued a report entitled "Final Reports of the Federal Building and Fire Investigation of the World Trade Center Disaster" ("NCSTAR 1").  Id.  Dr. Reynolds complains that the statutory purpose of the NIST investigation was to "determine why and how WTC1 and WTC2 collapsed following the initial impacts of the aircraft," but due to defendants' fraud and deceit, NIST changed the focus of NCSTAR 1 to a study of the "probable collapse sequence."  Id. ¶¶ 5-6.  Reynolds alleges that NCSTAR 1 is fraudulent on its face, stating "[i]t is also clear and apparent on its face that NIST's explanation of the destruction of WTC 1, 2 issued in … September, 2005, is blatantly false, incomplete, misleading and fraudulent."  Id. ¶ 50 (emphasis added).  Affirmation of David M. Pollack ¶¶ 13-16 (hereinafter "Pollack Aff.").

Although NIST is not named as a defendant, Reynolds accuses NIST of  being aware that directed energy weapons were the true cause of the destruction of the WTC complex, and intentionally presenting a "false and misleading, fraudulent and illegal report."  Complaint ¶ 52. Reynolds alleges that NIST and the defendants knowingly participated in a "scheme" to cover up the truth that the "destruction of the WTC on September 11, 2001 was caused … by the use of Directed Energy Weapons consisting in High Energy Lasers and … other secret weapons."  Id. ¶ 50.

He asserts that defendants Science Applications International Corporation ("SAIC) and Applied Research Associates, Inc. ("ARA") have a primary expertise in the "development of Directed Energy Weapons (DEW) and psychological operations (psy ops)" and that it is a "small wonder, then, that NIST did not investigate what caused the destruction of WTC 1, 2; namely DEW, carried out in the manner of a psy op." Id. ¶ 9, 21.  He alleges that in January 2006, the defendant Boeing was awarded an Air Force Contract for Directed Energy and Space Surveillance Research & Development, and is presently developing an "Airborne Laser (ABL) that serves as a platform for the use of High Energy Lasers (HEL) that … have the capacity to pulverize steel [and] destroy buildings in mere seconds, as happened to WTC 1, 2 on 9/11/01." Id. ¶ 23.  Pollack Aff. ¶¶ 18-20.

Reynolds contends that "no jetliner hit WTC 1, 2."  Complaint ¶ 19.  His theory is that the visual image of jetliner hitting the WTC was a "false flag operation," also known as "a manifested psychological operation ('psy op')," and that such "psy ops" are highly classified, secret instrumentalities of the Armed Forces of the United States of America.  Id.  ¶¶ 10-12.  He alleges that defendants concealed the real cause of the WTC destruction by using "false, misleading and fraudulent simulations."  Id. ¶ 7.  The simulations allegedly show a hollow aluminum aircraft impacting with structural steel and "nonetheless glid[ing] right through such steel … and leav[ing] an airplane shape, no less, as though this event were a cartoon much like the Roadrunner."  Id.  He contends that the plane simulations "violate the Data Quality Act and the False Claims Act," Id., and that all of the information which defendants compiled in NCSTAR 1-8 – including several thousand pages of text, graphic displays, simulations, charts – is fraudulent and was intended to hide the fact that the WTC was destroyed by the use of "exotic weaponry known as Directed Energy Weapons." Id. ¶ 5.  Pollack Aff. ¶¶ 21-23.

Reynolds alleges that NIST purposefully contracted with defense contractors such as SAIC, ARA and Boeing because these defendants could produce a report that would conceal or divert

4

attention from the fact that directed energy weaponry destroyed the WTC complex.  Complaint

¶ 51.  Specifically, the Complaint alleges NIST's intent to conceal the use of directed energy

weapons as follows:

> In other words, NIST contracted with those who have the greatest familiarity with
> directed energy weapons <u>in order to produce a report that sought to go to any length
> necessary to avoid, disguise, omit and otherwise divert attention away from the
> actual, real and intended destruction of the WTC complex by use of one device,
> namely directed energy weaponry</u>, while pretending that the cause was the result of
> conditions that would be impossible based on the extent to which the NIST report,
> NCSTAR 1 violated both the laws of physics and common sense.

<u>Id.</u> ¶ 51.  Pollack Aff. ¶ 24.

The Complaint alleges that the defendants knowingly submitted cost reports, requisitions,

and billing statements from 2002 through September 2005 that contained false claims for

reimbursements concerning their work, Complaint ¶ 57, because the defendants "knew they

included costs that the actual cause of the destruction of the WTC complex was the result of the use

of directed energy weapons."  <u>Id.</u> ¶ 58.  The Complaint does not identify any specific conduct by

defendant Computer Aided Engineering Associates, Inc. ("CAE") but alleges, generally, that

defendant Simpson Gumpertz & Heger, Inc. ("SGH") had an expertise that "could have been, but

was not, used for purposes of calling attention to the fact that the … destruction of WTC 1, 2 could

not have been caused by jetliner impacts."  <u>Id.</u> ¶ 33.  The Complaint alleges that SGH "chose to use

its expertise to commit fraud based on either withholding information or manipulating information

and by then accepting payment improperly."  <u>Id.</u>  Pollack Aff. ¶¶ 25-26.

Reynolds alleges that he is an "original source" of the allegations of fraud set forth in his

Complaint.  Complaint ¶15, 53.  He says that on March 8, 2007, he submitted a Request for

Correction ("RFC letter") to NIST which challenged NCSTAR "in its entirety," <u>Id.</u> ¶ 7, and that this

March 8th RFC and the "Supplement thereto" contains the "original source" information.  <u>Id.</u> ¶¶ 15,

53. In particular, he claims that the March 8, 2007 RFC "plainly stated that the WTC complex was destroyed by the use of directed energy weapons." Id. ¶ 53.[2] Pollack Aff. ¶ 27.

### B.    Facts Alleged In Dr. Reynolds' March 8, 2007 Request For Clarification

The Reynolds' "Request for Correction per Section 515 of Public Law 106-554," dated March 8, 2007, is a 13-page letter, with a 5-page addendum, that is addressed to "Chief, Management and Organization Division" of National Institute of Standards and Technology, and is attached to the Complaint as Exhibit "A." See Complaint, Ex. A, March 8, 2007 RFC.  It sets forth eight NIST web site addresses where Reynolds says that he obtained the NCTAR report, and accuses NIST of violating information quality standards. Id. at 1-3.[3]  The March 8, 2007 RFC makes no mention of either directed energy weapons or psy ops, but instead criticizes NIST for relying on fraudulent data for its analysis of aircraft impacts in the NCSTAR 1 report. Id. at 1-6. Specifically, Reynolds alleges that the computer simulations commissioned by NIST depict a lack of deceleration upon impact, and therefore violate "several laws of physics." Id. at 4-6.  Pollack Aff. ¶¶ 29-31.

Additionally, Reynolds contends that all videos that record United Airlines Flight 175 penetrating the South Tower are "fake evidence" and "involve special effects of some kind" because the videos "show no collision/crash and no deceleration."  Complaint, Ex. A., March 8, 2007 RFC at 5.  The RFC concludes that "despite the . . . 'creative' physics of NIST . . . [a] jetliner cannot push through steel walls, steel-reinforced concrete floors, and a steel core of 47 cross-braced steel columns …" Id. at 6-7.  Reynolds accuses NIST of "fixing the intelligence" saying that "[i]f

---

[2] This statement is inaccurate because  Reynolds' March 8, 2007 RFC, attached to the Complaint as Exhibit "A", makes no mention of directed energy weapons.  Reynolds first mentions directed energy weapons in his RFC Supplement # 1, filed on May 1, 2007.  Compare Ex. A, RFC dated March 8, 2007 with Ex. A, Supplement #1 to RFC, dated May 1, 2007 (Reynolds makes no mention of psy ops or directed energy weapons in his March 8th RFC, but in his May 1, 2007 Supplemental RFC, he states that "directed energy weapons were a causal factor in destruction of the WTC on 9/11" and credits an earlier Request for Clarification that was filed with NIST on March 16, 2007 by Dr.  Judy Wood).

[3] Dr. Reynolds' RFC letter, dated March 8, 2007, does not contain page numbers.  To assist the Court, and for ease of reference, defendants have included page numbers in their citations to the RFC letter.  Defendants' citations identify the first page of the RFC as page one, and the following pages are numbered sequentially.

NIST engaged in conscious fraud, as is likely, the British would call it 'fixing the intelligence to fit the policy.'"  Id. at 6.  In the second half of his RFC letter, Reynolds sets forth numerous quotations from the NCSTAR report regarding the average airspeed of the aircraft as it impacted the exterior wall panel, and the reduction in speed or "deceleration" which occurred.  Id. at 8-13.  Interspersed within these quotations from the NCSTAR report are Reynolds' own "Comments," in which he points out what he believes are the scientific flaws in the NIST conclusions about the airspeed of the airliners as they entered the towers.  Id. at 9-13.  He states that a "flimsy, high-speed jetliner must decelerate sharply upon impacting a strong, massive fixed object like a skyscraper unless the jetliner acquires more energy from somewhere …"  Id. at 5.  Pollack Aff. ¶¶ 32-35.

Reynolds also disagrees with NIST's conclusion that the outer wings "shredded" against the steel in the tower and that the wing material was carried into the buildings.  Complaint, Ex. A, March 8, 2007 RFC at 7.  He argues that this is "impossible," because the steel should have bounced the jetliner pieces outside each tower, but  neither NIST nor any other investigation has produced "a single … part with its unique serial number from any of the alleged commercial aircraft of 9/11 … to prove aircraft identity."  Id. at 7-8.  Pollack Aff. ¶ 36.

C.    **Facts Alleged In Dr. Reynolds' May 1, 2007 Supplemental RFC**

The Reynolds' May 1, 2007 Supplement to RFC Submitted March 8, 2007 ("Supplemental RFC") is a 4-page letter that is addressed to "Chief, Management and Organization Division" of National Institute of Standards and Technology, and is attached to the Complaint as Exhibit "A."  See Complaint, Ex. A., May 1, 2007 Supp.  Unlike the original RFC, the Supplemental RFC makes explicit allegations that the WTC complex was destroyed by directed energy weapons, and asserts that defendant SAIC has a conflict of interest that affects the  integrity of its work for NIST, because SAIC is engaged in developing directed energy weapons.  Id. at 1-2.  In making the statement that "directed energy weapons were a causal factor in destruction of the WTC on 9/11,"

the Supplemental RFC credits an earlier Request for Clarification that was filed with NIST on

March 16, 2007 by Dr. Judy Wood.  Id. (the Supplemental RFC states "see Dr. Judy Wood's RFC

filed on March 16, 2007").  Pollack Aff. ¶¶ 37-39.

## IV.    ARGUMENT

### A.    The Complaint Should Be Dismissed Because The District Court Lacks Subject Matter Jurisdiction

Federal courts are of limited jurisdiction and must "police jurisdictional issues promptly and

closely."  United States ex rel. Alcohol Found. v. Kalmanovitz Charitable Found., Inc., 186 F. Supp.

2d 458, 461 (S.D.N.Y. 2002).  A district court must dismiss a case for lack of subject matter

jurisdiction under Fed. R. Civ. P. 12(b)(1) if it "lacks the statutory or constitutional power to

adjudicate it."  Aurechione v. Schoolman Transp. System, Inc., 426 F.3d 635, 638 (2d Cir. 2005).

The question whether subject matter jurisdiction exists under Rule 12(b)(1) is distinct from the

question whether the plaintiff can state a claim for relief under Rule 12(b)(6).  Carlson v. Principal

Fin. Group, 320 F.3d 301, 306 (2d Cir. 2003).  On a motion to dismiss for lack of subject matter

jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), "'the plaintiff bears the burden of proving subject

matter jurisdiction by a preponderance of the evidence.'"  United States ex rel. Anti-Discrimination

Center v. Westchester County, 2007 U.S. Dist. Lexis 50589, * 7 (S.D.N.Y. 2007) quoting

Aurechione v. Schoolman Transp. Sys., Inc., 426 F.3d at 638.  A court must "'accept as true all

material factual allegations in the complaint," but refrain from "drawing from the pleadings

inferences favorable to the party asserting jurisdiction."  Anti-Discrimination Center, supra at * 7

quoting APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003).  The court may consider evidence

outside of the pleadings in resolving factual challenges to subject matter jurisdiction.  United States

v. Space Hunters, Inc., 429 F.3d 416, 425-26 (2d Cir. 2005).  As discussed below, Reynolds' FCA

claims in Counts One, Two and Three should be dismissed pursuant to Rules 12(b)(1) and 12(h)(3)

for lack of subject matter jurisdiction because Reynolds has provided no factual basis in his

Complaint for concluding that he is the original source of the information forming the basis of his

FCA claims, and therefore, the Court lacks jurisdiction under the FCA's Original Source Rule.  See

31 U.S.C. § 3730(e)(4).

The False Claims Act, 31 U.S.C. § 3729 *et seq*, as amended in 1986, prohibits false or

fraudulent claims for payment to the United States, see 31 U.S.C. § 3729(a), and authorizes civil

actions to remedy such fraud to be brought by the Attorney General, see § 3730(a), or by private

individuals in the Government's name, see § 3730(b)(1), as a "*qui tam*" relator.  See Rockwell Int'l

Corp. v. United States, 127 S. Ct. 1397, 167 L. Ed. 190, 201 (2007).  The government may either

intervene and prosecute the action, see § 3730(b)(2), or allow the original plaintiff – the *qui tam*

relator – to proceed with the suit under § 3730(b)(4)(B).[4]  In the present case, the United States has

declined to intervene in Dr. Reynolds' lawsuit.

Dr. Reynolds purports to be a *qui tam* relator, and therefore the focus of this proceeding is

upon the *qui tam* provisions of the Act.  "*Qui tam*" is part of the longer Latin phrase "*qui tam pro*

*domino rege quam pro se ipso in hac parte sequitur*," which means "who pursues this action on our

Lord the King's behalf as well as his own."  Walburn v. Lockheed Martin Corp., 431 F.3d 966, 970

(6th Cir. 2005).  As discussed below, Dr. Reynolds does not have standing to bring this *qui tam*

action as a relator under the False Claims Act because the District Court lacks subject matter

jurisdiction, under the jurisdictional bar set forth in 31 U.S.C. § 3730(e)(4).  Specifically,

§ 3730(e)(4)(A) divests this Court of subject matter jurisdiction because Reynolds' claims are based

upon information of which he was not the original source.

Section 3730(e)(4) of the False Claims Act defines the jurisdiction of a federal court over

*qui tam* actions, and bars jurisdiction if the information giving rise to the *qui tam* claim was subject

---

[4] Under 31 U.S.C. § 3730(b)(1), the *qui tam* complaint must be filed *in camera* and must remain under seal for at least sixty days, see id. § 3730(b)(2), unless the government decides to intervene.  After the sixty-day seal period expires, the government may "notify the court that it declines to take over the action," in which case the relator has the "right to conduct the action."  Id. § 3730(b)(4)(B).  See United States v. Baylor Univ. Med. Center, 469 F.3d 263, 269 (2d Cir. 2006).

to public disclosure through an administrative report or investigation, unless the individual bringing

suit is the "original source" of the information.  See 31 U.S.C. § 3730(e)(4).  Section 3730(e)(4) sets

out a two-part test to determine whether a court has subject matter jurisdiction over the plaintiff's

*qui tam* action, as follows:

> (e)      Certain actions barred.
>
> (4)(A) No court shall have jurisdiction over an action under this section based upon
> the public disclosure of allegations or transactions in a criminal, civil, or
> administrative hearing, in a congressional, administrative, or Government
> Accounting Office report, hearing, audit, or investigation, or from the news media,
> unless the action is brought by the Attorney General or the person bringing the
> action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has
> direct and independent knowledge of the information on which the allegations are
> based and has voluntarily provided the information to the Government before filing
> an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4).  This provision was part of the 1986 amendments to the FCA, and was an

"attempt to strike a balance between encouraging private citizens to expose fraud and avoiding

parasitic actions by opportunists who attempt to capitalize on public information without seriously

contributing to the disclosure of the fraud."  United States ex rel. Doe v. John Doe Corp., 960 F.2d

318, 321 (2d Cir. 1992).  Because *qui tam* plaintiffs are entitled to a portion of the proceeds of

successful suits, there is the potential for "parasitic lawsuits by those who learn of the fraud through

public channels."  Id.  The term "parasitic" actions is used to characterize *qui tam* suits by

individuals seeking quick cash without assisting in exposing the fraud.  Id.

In deciding whether the statutory bar to jurisdiction applies, a court must first determine

whether there has been a "public disclosure" of the wrongdoing which occurred in one of the ways

set forth in the statute.  Section 3730(e)(4)(A) provides an exclusive list of the modes by which a

public disclosure must occur for the jurisdictional bar to apply.  Id.  The public disclosure must

occur in a "criminal, civil, or administrative hearing, in a congressional, administrative, or

10

Government Accounting Office report, hearing, audit, or investigation, or from the news media."
31 U.S.C. § 3730(e)(4).  See United States ex rel. Dick v. Long Island Lighting Co., 912 F.2d 13, 16
(2d Cir. 1990).  Here, there is no serious question that the mode of disclosure was through a source
enumerated in the statue – i.e., the administrative report of a federal agency.

The gravamen of Reynolds' Complaint is that all of the defendants have engaged in fraud by
supplying NIST with false information and data that was included in a NIST report.  Specifically,
Reynolds' Complaint challenges the validity of scientific information included in the final report of
the NIST investigation of the collapse of the World Trade Center (WTC) towers, conducted under
the National Construction Safety Team Act, commonly known as NCSTAR 1-2.  Reynolds'
Complaint alleges that NCSTAR 1-2 is fraudulent "on its face."  See Complaint ¶ 50 ("[i]t is also
clear and apparent on its face that NIST's explanation of the destruction of WTC 1, 2 issued in …
September, 2005, is blatantly false, incomplete, misleading and fraudulent") (emphasis supplied).
The Complaint challenges the credibility of, *inter alia*, NCSTAR 1's explanation of the focus of the
investigation, see Complaint, ¶¶ 5-6, the computer simulations which allegedly show a hollow
aluminum aircraft "glid[ing] right through … steel … as though this event were a cartoon much like
the Roadrunner, Id. ¶ 7, the lack of aircraft "deceleration" which Reynolds says violates "several
laws of physics," Id. Ex. A, ¶ 4-6, as well as the videos that record United Airlines Flight 175,
which he describes as "fake evidence."  Id.  In short, the allegations in his Complaint consist of a
list of the specific aspects of NCSTAR 1-2 which Reynolds contends are fraudulent.

NCSTAR 1-2 is an administrative report within the meaning of the FCA, and the
jurisdictional bar applies because it was publicly disclosed.  Indeed, the allegations of Reynolds'
own *qui tam* Complaint state explicitly that NCSTAR 1-2 is publicly disseminated by NIST on its
website.  See Complaint, Ex. A, March 8, 2007 RFC, p. 3.  Reynolds alleges that he obtained a copy
of NCSTAR 1-2 on the NIST website, and provides references to the specific NIST web site

addresses, or URLs, where he found the purportedly "fraudulent" information.  Id. ("the source

from which requester obtained the information is the NIST web site at the following pages …").

Thus, the so called wrongdoing was publicly disclosed because NCSTAR 1-2 was, and still is,

available to anyone who wishes to consult the NIST website.  As explained by the Second Circuit in

United States ex rel. Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148, 1158 (2d

Cir. 1993), the § 3730(e)(4) jurisdictional bar "was designed to preclude *qui tam* suits based on

information that would have been equally available to strangers to the fraud transaction had they

chosen to look for it as it was to the relator."  Id.

        In the recent case of United States ex rel. Anti-Discrimination Center v. Westchester

County, the District Court for the Southern District of New York explained the rationale for the

jurisdictional bar in the specific context of an administrative report, as follows:  "[i]f the

information is derived from a federal government report, then the federal government has the

information and can act appropriately, and barring FCA actions in such situations serves the

legislative purpose of the 1986 amendments to 'avoid[] parasitic actions by opportunists who

attempt to capitalize on public information without seriously contributing to the disclosure of the

fraud.'"  United States ex rel. Anti-Discrimination Center v. Westchester County, 2007 U.S. Dist.

Lexis 50589, * 22 (S.D.N.Y. 2007).

        Additionally, Reynolds cannot be heard to argue that his allegations are not derived "solely"

from the publicly disclosed NCSTAR 1-2 report and/or that the jurisdictional bar should not apply

because he obtained some of the information through his own independent investigation.  Although

Reynolds faults NCSTAR 1-2 for not disclosing that "directed energy weapons" were the cause of

the destruction of the WTC complex, see Complaint ¶¶ 1-6, 21, 50, 53, he has provided no proof

that directed energy weapons were, in fact, used on 9/11, and he acknowledges that his suspicions

are based primarily upon news and other media reports that "point to SAIC's involvement in

directed energy weapons." See Complaint, Ex. A, Supplement # 1 to RFC, p. 1. For example, he

cites to an RFC submitted to NIST by Dr. Judy Wood on March 16, 2007, as authority for his

directed energy weapons theory. Id. Additionally, he provides a quote from the SAIC 2006 Annual

Report (which is available on the SAIC website) that states, "SAIC's expertise on high-energy

lasers – weapons that can destroy ballistic missiles in flight – spans more than 30 years …" Id.,

Supplement #1 to RFC, p. 2. Thus, it appears that Reynolds obtained all of his information either

from an administrative report, the news media, or another mode listed in the statute, so that the

jurisdictional bar still applies, even if the NCSTAR report is not the "sole" source of his

information. The Second Circuit has clarified that the phrase "solely" is not included in

§ 3730(e)(4)(A), and that the statutory bar applies to "a *qui tam* action … based in any part upon

publicly disclosed allegations or transactions." Kreindler, 985 F.2d at 34. See also, John Doe, 960

F.2d at 324 ("public disclosure of the allegations divests district courts of jurisdiction over *qui tam*

suits, regardless of where the relator obtained his information").

        In this case, there is no serious dispute that Reynolds' lawsuit is based upon publicly

disclosed "allegations or transactions." Therefore, Reynolds' *qui tam* suit is barred unless he can

prove that the "original source" exception applies because he is an "original source" of that

information. See 31 U.S.C. § 3730(e)(4)(A). In his *qui tam* Complaint, Reynolds alleges that he is

an "original source" of his allegations because on March 8, 2007, he submitted a Request for

Correction letter to NIST which challenged NCSTAR "in its entirety." See Complaint ¶¶ 15, 53.

To be an "original source," however, the relator must have "direct and independent knowledge of

the information on which the allegations are based." 31 U.S.C. § 3730(e)(4)(B). In Rockwell Int'l

Corp. v. United States, 127 S. Ct. 1397, 167 L. Ed. 2d 190, 205 (2007), the Supreme Court clarified

that the term "information" in subparagraph (B) refers to the relator's allegations – i.e., Reynolds

must have "direct and independent knowledge of the information upon which his allegations are

based." Id. at 208.  Here, Reynolds acknowledges in his Complaint that he gleaned the information

underlying his allegations directly from NCSTAR 1-2.  As noted above, Reynolds provides

references to the specific NIST web site addresses where he found the purportedly "fraudulent"

information.  See Complaint, Ex. A, March 8, 2007 RFC, p. 3.  Additionally, his March 8, 2007

RFC sets forth 5 pages of specific quotes from NCSTAR which form the basis of his claims.  Id.

Ex. A, RFC, p. 8.  Because Reynolds had "no direct and independent knowledge of any of this

publicly disclosed information, he was not an original source of that information, and his suit is

barred." Gold v. Morrsion-Knudson Co., 68 F.3d 1475, 1477 (2d. Cir. 1995).

    The recent case of United States ex rel. Alcohol Found., Inc. v. Kalmanovitz Charitable

Found., Inc., 186 F. Supp. 2d 458 (S.D.N.Y. 2002) aff'd 53 Fed. Appx. 153 (2d Cir. 2002) is also

instructive.  In Alcohol Foundation, the defendants were makers and purveyors of alcoholic

beverages.  Id.  The relator, Alcohol Foundation, alleged that  defendants caused misrepresentations

and false claims to be presented to the government for treatment of alcohol-related disease, because

the "alcoholic beverage industry has been selling, encouraging and inducing people to buy in

quantities sufficient to damage body and brain." Id. at 460.  Similar to the "conspiracy" among the

NIST contractors alleged by Reynolds in the present case, Alcohol Foundation alleged that there

was a conspiracy among the alcoholic beverage producers and marketers to defraud the public and

Government.  Id.  Additionally, as in the present case, the relator posed a number of "rhetorical

questions"[5] which the court described as "culminating in one question that essentially summarizes

its position:  'Does such a mix of power, money, influence, misleading image and lack of disclosure

result in a common law fraud on the federal government … and on the public?'" Id. at 461.

Alcohol Foundation did not dispute that the factual information on which it based its *qui tam* action

---

[5] Reynolds' *qui tam* Complaint contains the same type of rhetorical questions. For example, Reynolds complains that the outer wings of the airliners could not have "shredded" against a "web of steel" because "shredding would hold back a considerable amount of material in large crumpled pieces … yet pictures and videos show no aircraft debris fell to the ground below the impact zones … [w]here is the evidence of the shredded wing halves?"  Complaint, Ex. A., RFC, p. 8. In another section of his RFC, Reynolds asks "Imagine that a WTC tower toppled over and into a Boeing 767 parked on the ground.  What would happen?"  Id., RFC, p. 7.

was gleaned from "third parties' published articles," and was therefore publicly disclosed information.  However, it maintained that it was an "original source" within the meaning of the FCA, because "while the facts were publicly disclosed, the allegation of fraud is entirely new."  Id. It argued that its allegations arose out of the "'perspective' that [its] members obtained by spending hundreds of hours compiling facts into a 'mosaic,'" Id. at 461, and that it had direct and independent information based on its "creation of the 'mosaic' of information." Id. at 463 (emphasis supplied).  It argued that "the scientific and scholarly works from which it developed its Submission are too technical for the average member of the public to understand," Id. at 464, and "an average member of the public could neither understand the [publicly available] information … nor perceive a fraud absent Alcohol Foundation's compilation."  Id. at 463.  Thus, the district court was required to determine whether Alcohol Foundation's efforts in explaining and synthesizing the information transformed it into an "original source."  Id. at 461.

The district court found that the decision and analysis of subject matter jurisdiction in Kreindler v. Kreindler, 985 F.2d 1148 (2d. Cir. 1993) was binding authority, because the Second Circuit adopted the Third Circuit's reasoning, as expressed in United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1155-56 (3d Cir. 1991), that § 3730(e)(4) was "'designed to preclude qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator.'"  Id. quoting Kreindler, 985 F.2d at 1158-59.  The court concluded that the relator, Alcohol Foundation, was merely a perceptive third-party and did not have first-hand knowledge of a wrong and/or its perpetrators.  Id. at 464.  Moreover, the district court concluded that it lacked subject matter jurisdiction for the additional reason that Alcohol Foundation had not specified what claims deriving from defendants were submitted to the government for payment or approval, and thus its

theory sought to expand the definition of a "false claim" to "address a generic definition of 'fraud,' without direct link to specific claims submitted to the government for approval or payment."  Id.

As the Alcohol Foundation court noted, Congress enacted the § 3730(e)(4) jurisdictional bar in order to prevent opportunistic persons from abusing the *qui tam* procedure for self aggrandizement, Alcohol Foundation, *supra* at 464, and  there is no indication that Congress intended for the *qui tam* procedure to be available to "those pursuing a less pecuniary and more expansive social agenda."  Id.  Here, the court should rule that Reynolds *qui tam* action is barred because he has based his lawsuit on publicly disclosed information in violation of § 3730(e)(4)(A) and he is not the original source of that information under § 3730(e)(4)(B).  Like the relator in Kreindler, the fact that Dr. Reynolds conducted some "collateral research and investigations" does not establish "direct and independent knowledge of the information on which the allegations are based" within the meaning of § 3730(e)(4)(B).  See also United States v. New York Med. College, 252 F.3d 118, 121 (2d Cir. 2001)(affirming dismissal of complaint because a third party was the core source of information underlying the claim).  Accordingly, Counts One, Two and Three should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

## B.    The Complaint Should Be Dismissed Because It  Fails To Plead Fraud With Particularity Under Rule 9(b)

Not all fraudulent conduct gives rise to liability under the FCA.  Under the three subdivisions of § 31 U.S.C. § 3729(a) invoked by Reynolds, liability is imposed, *inter alia*, on one who "knowingly presents, or causes to be presented, to … the United States Government … a false or fraudulent claim for payment or approval," see 31 U.S.C. § 3729(a)(1); "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; see 31 U.S.C. § 3729(a)(2); or "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  See 31 U.S.C. § 3729(a)(7) (commonly called the

16

"Reverse False Claims Act"). Thus, the statute "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 225 (1st Cir. 2004).

The Second Circuit, as well as the federal courts in every jurisdiction in the country, have emphasized that a defendant's presentation of a false or fraudulent claim to the government is a central element of every False Claims Act case. Gold v. Morrison-Knudson Co., 68 F.3d at 1476-77. See also Yuhasz v. Brush Wellman, Inc., 341 F.3d 559, 562-63 (6th Cir. 2003); United States ex rel. Clausen v. Lab Corp. of Am., Inc., 290 F.3d 1301, 1308-09 (11th Cir. 2002), cert. denied, 537 U.S. 1105, 154 L. Ed. 2d 774, 123 S. Ct. 870 (2003); United States ex rel. Totten v. Bombadier Corp., 351 U.S. App. D.C. 30, 286 F.3d 542, 551-52 (D.C. Cir. 2002); Bly-Magee v. California, 236 F.3d 1014, 1018 (9th Cir. 2001); Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 783-84 (4th Cir. 1999); United States ex rel. LaCorte v. SmithKline Beechan Clinical Labs, Inc., 149 F.3d 227, 234 (3rd Cir. 1998); United States ex rel. Thompson v. Columbia/HCA Heathcare Corp., 125 F.3d 899, 903 (5th Cir. 1997); see also John T. Boese, Civil False Claims and Qui Tam Actions § 5.04 (2d ed. 2000 & Supp. 2003)("Every major federal court of appeals has held that because the essence of a False Claims Act claim is fraud, Rule 9(b) applies to FCA cases … . The applicability of Rule 9(b) to qui tam actions is by now beyond dispute.").

Here, as in Alcohol Foundation, the relator's theory seeks to expand the definition of "false" claim or record to address "a generic definition of 'fraud' without direct link to specific claims submitted to the Government for approval or payment." Alcohol Foundation, supra at 464. Although Dr. Reynolds' qui tam Complaint is over 61 pages in length, it fails to identify a single specific instance of either SGH or CAE submitting a fraudulent bill to the government, and consists instead of a diatribe about what he perceives to be the scientific shortcomings of NCSTAR 1-2, including numerous conclusory allegations about a "scheme" between NIST and the defendants to

cover up the fact that directed energy weapons felled the WTC complex.  Compare United States ex rel. Smith v. New York Presbyterian Hosp., 2007 U.S. Dist. Lexis 53826, * 20-22 (S.D.N.Y. 2007)("[a]mended complaint … consists solely of conclusory allegations … and … fails to state a single specific instance of a defendant submitting a fraudulent bill to the government"); see also Karvelas v. Melrose-Wakefield Hosp., 360 F.3d at  233 ("as Karvelas himself concedes … his complaint "did not set forth the specifics … of any one single cost report, or bill, or piece of paper that was sent to the Government to obtain funding").

The Second Circuit has clarified that FCA claims must comply with Rule 9(b).  See Eisenstein v. Whitman, 4 Fed. Appx. 24, 26 (2d Cir. 2001); Gold v. Morrison-Knudson Co., 68 F.3d 1475, 1476-77 (2d Cir. 1995); United States ex rel. Sarafoglou, 451 F. Supp. 2d 613, 623 (S.D.N.Y. 2006).  Fed. R. Civ. P. 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Thus, to meet the requirements of Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).  In short, a plaintiff must "set forth the who, what, when, where and how of the alleged fraud."  United States ex rel. Sarafoglou v. Weill Med. College, 451 F. Supp. 2d 613, 621 (S.D.N.Y. 2006).  These requirements promote three purposes of Rule 9(b), "namely:  (1) ensuring that defendants have sufficient notice of plaintiff's claims; (2) discouraging strike suits; and (3) preventing the filing of suits that simply hope to uncover the basis for some previously unspecified wrongdoing."

In the present case, Reynolds has failed to link the defendants' allegedly fraudulent practices to the submission of even a single fraudulent claim.  Although he presents a shadowy sketch of the "who, what, when, where and how," his theory of FCA fraud is based solely upon conjecture,

surmise and innuendo.  His allegations of fraudulent billing are merely conclusory assumptions and are devoid of the type of detail and specificity that a relator is required to allege under Rule 9(b) because he has failed to allege even a single example of, or details about, a fraudulent claim.  <u>Smith v. New York Presbyterian Hosp.</u>, *supra* at  * 20-22 (S.D.N.Y. 2007).  He has not identified a specific amount of charges that were submitted by a particular defendant, or provided the date when a false claim was submitted, or provided a copy of a single invoice or bill that was paid.  These deficiencies in Reynolds' pleadings unfairly deny SGH and CAE notice of the alleged fraud.  <u>See Smith v. New York Presbyterian Hosp.</u>, *supra* at * 20-22.  ("[w]ithout a description of any actual fraudulent billing, [d]efendant is forced to search its records for evidence to prove it did not commit fraud, releasing [relator] from the burden of proving that fraud was actually committed").  Since none of Reynolds' allegations or exhibits provides any information about a specific, fraudulent bill sent to and paid for by the government, his First Cause Of Action (31 U.S.C. § 3729(a)(1)), Second Cause Of Action (31 U.S.C. § 3729(a)(2)), and Third Cause Of Action (31 U.S.C. § 3729(a)(7)) must be dismissed.

Furthermore, Reynolds should not be permitted to plead generally at the outset and then fill in the blanks with discovery.  As noted recently in <u>Smith v. New York Presbyterian Hosp.</u>, "[o]ne of the purposes of Rule 9(b) is to discourage the filing of complaints 'as a pretext for discovery of unknown wrongs.'"  <u>Smith v. New York Presbyterian Hosp.</u>, *supra* at * 21 <u>citing</u> <u>Madonna v. U.S.</u>, 878 F.2d 62, 66 (2d Cir. 1989).  <u>See</u> <u>also</u> <u>Decker v. Massey-Ferguson, Ltd.</u>, 681 F.2d 111, 116 (2d Cir. 1982)("Rule 9(b) [fails] in its purpose if conclusory generalizations … permit a plaintiff to set off on a long and expensive discovery process in the hope of uncovering some sort of wrongdoing …").  Reynolds' *qui tam* Complaint does not even come close to providing the type of detail required by Rule 9(b), and therefore, this Court should dismiss the *qui tam* action with prejudice. <u>Smith v. New York Presbyterian Hosp.</u>, *supra* at * 25 ("[a] with-prejudice dismissal is appropriate

under Rule 9(b) where there is a 'good reason' to deny the plaintiff leave to amend, including where

it appears that any amendment would be futile").

**C.    The Complaint Should Be Dismissed Because The Information Quality Act ("IQA") Provides An Exclusive Administrative Process For Challenging The Quality Of Information Disseminated By Federal Agencies**

Reynolds' lawsuit should also be dismissed because it violates the intent of the Information

Quality Act ("IQA"), also known as the Data Quality Act, which establishes an administrative

process for information correction requests and appeals.  Reynolds' *qui tam* Complaint states that he

has filed a Request for Correction ("RFC") dated March 8, 2007, and a "Supplement #1 to RFC

submitted March 8, 2007."  Both of these documents are attached to the *qui tam* Complaint as

Exhibit A.  The Complaint does not disclose whether NIST has issued a decision on Reynolds' RFC

submissions.  Upon information and belief, however, NIST notified Reynolds in August 2007 that

his March 8, 2007 RFC and May 1, 2007 Supplement are still under review.  Accordingly,

Reynolds filed this Complaint before NIST issued a decision on his request for correction.

The language of the IQA reflects Congress's intent that "any challenges to the quality of

information disseminated by federal agencies should take place in administrative proceedings

before federal agencies and not in the courts." Salt Inst. v. Thompson, 345 F. Supp. 2d 589, 601

(E.D. Va. 2004) aff'd Salt Inst. v. Leavitt, 440 F.3d 156 (4th Cir. 2006).   The IQA is located at

Section 515 of the Treasury and General Government Appropriations Act for Fiscal Year 2001

(Public Law 106-554) and directs the Office of Management and Budget ("OMB") to issue

government-wide guidelines that "provide policy and procedural guidance to Federal agencies for

ensuring and maximizing the quality, objectivity, utility and integrity of information …

disseminated by Federal agencies."  Pub. L. No. 106-554, § 1(a)(3) [Title V, § 515] (Dec. 21,

2000)(published at 44 U.S.C. § 3516 note).  OMB complied by issuing guidelines on February 22,

2002.  See 67 Fed. Reg. 8452.  The OMB Guidelines direct each Federal agency to:  (1) "adopt

specific standards of quality that are appropriate for the various categories of information they disseminate;" (2) "develop a process for reviewing the quality … of information before it is disseminated;" (3) "establish administrative mechanisms allowing affected persons to seek and obtain, where appropriate, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines;" and (4) provide OMB with reports regarding the agencies' information quality guidelines and any information quality complaints they receive.  67 Fed Reg. at 8458-59.  OMB guidelines state that agencies should correct information only "where appropriate" and must also "establish an administrative appeal process to review the agency's initial decision."  Id. at 8459.

NIST has issued the National Institute Of Standards And Technology Guidelines, Information Quality Standards, And Administrative Mechanism ("NIST Guidelines") which implements Section 515 and fulfills the OMB and Department of Commerce (DOC) information quality guidelines.  See National Institute Of Standards And Technology Guidelines, Information Quality Standards, And Administrative Mechanism, http://www.nist.gov/director/quality standards.htm.  Pollack Aff. ¶ 40.  The NIST Guidelines establish a process for submission of Requests for Correction, and state that "The Chief, NIST Management and Organization Division will attempt to communicate either a decision on the request, or a statement of the status of the request … within 60 calendar days."  Id.

Although Reynolds has styled his suit as a *qui tam* FCA action, the gist of the Complaint is contained in his RFC submissions, which are attached to the Complaint as Exhibit A.  The Complaint alleges that Reynolds is an "original source" because of the March 8, 2007 RFC, see Complaint, ¶¶ 15, 53, which "challenged NCSTAR 1 in its entirety."  Id. ¶ 7.  Reynolds' lawsuit should therefore be dismissed for the additional reason that he has not exhausted the administrative process called for under the NIST Guidelines which provide for both an initial petition and an

administrative appeal.  Every court which has been presented with an IQA claim has recognized that there is no private right of action under the IQA, and has dismissed the lawsuit due to lack of a right to judicial review of IQA information correction requests.  See Americans For Safe Access v. U.S. Dep't of Health & Human Serv., 2007 U.S. Dist. Lexis 55597, * 8-9 (N.D. Cal. 2007); In re Operation of the Missouri River Sys.  Litig., 363 F. Supp. 2d 1145, 1174 (D. Minn. 2004), *vacated in part and aff'd in part on other grounds*, 421 F.3d 618 (8th Cir. 2005).  In the Salt Institute decision, the Fourth Circuit affirmed the district court's dismissal of the suit, stating that "the IQA … does not create any legal right to information or its correctness."  Salt Inst. v. Leavitt, 440 F.3d at 159.  Accordingly, since the IQA provides only an administrative remedy, and Dr. Reynolds has not exhausted the administrative process set forth in the NIST Guidelines, his *qui tam* Complaint, which is based upon his March 8, 2007 RFC and May 1, 2007 Supplement, should be dismissed.

**D.**      **The Complaint Should Be Dismissed Because Reynolds Lacks Standing To Bring The Common Law Causes Of Action**

As noted above, Reynolds has also alleged common law causes of action against defendants SGH and CAE for unjust enrichment, payment by mistake, recoupment of overpayments and fraud. All of these counts must be dismissed because Reynolds does not allege that he personally suffered a cognizable injury as a result of SGH or CAE's alleged wrongdoing.  Instead, Reynolds' common law causes of action for unjust enrichment, payment by mistake, recovery of overpayments, and fraud all purport to allege an injury on behalf of the United States, and seek damages on behalf of the United States.  See Complaint ¶¶ 70-71, 73-74, 76-77, 79.  Specifically, Reynolds' common law causes of action seek the "recovery of monies" on behalf of the United States.  Id.  It is well settled, however, that a relator in a *qui tam* action lacks standing to assert common law claims based upon an alleged injury sustained by the United States.  See United States ex rel. Phipps v. Comprehensive Cmty. Dev. Corp., 152 F. Supp. 2d 443, 451-52 (S.D.N.Y. 2001); United States ex rel. Rockefeller,

22

274 F. Supp. 2d 10, 14 (D.D.C. 2003); <u>United States ex rel. Beattie</u>, 2001 U.S. Dist. Lexis 26185,

* 15 (M.D.Fla. 2001).

      As explained by the New York District Court in <u>Phipps</u>, "the FCA permits a relator alleging

an FCA violation to meet the 'injury in fact' standing requirement … [but] 'does not give relators

the right to assert common law claims on behalf of the United States.'" <u>Id.</u> quoting <u>United States v.</u>

<u>Eastman Kodak Co.</u>, 98 F. Supp. 2d 141 (D. Mass. 2000).  Here, as in <u>Phipps</u>, the relator has not

alleged that he suffered an injury in fact and is asserting these common law claims on behalf of the

government.  <u>Phipps</u>, *supra* at 451-52; <u>Compare</u> <u>United States v. United Techs. Corp.</u>, 255 F. Supp.

2d 779, 785 (S.D. Ohio 2003)(the government in an FCA case may pursue common law and FCA

claims together because, while the government "will not be allowed to recover twice, [it] may defer

its election of remedy until trial").  Dr. Reynolds has failed to demonstrate that he has standing to

bring the common law claims.  Therefore, this Court lacks subject matter jurisdiction over the

plaintiff's common law claims and must dismiss them pursuant to Fed. R. Civ. P. 12(b)(1).

      **E.**     **The Court Should Award Attorney's Fees To Defendants SGH and CAE**

      Defendants SGH and CAE seek an award of attorney's fees and costs under 31 U.S.C.

§ 3730(d)(4).  Section 3730(d)(4) provides reasonable attorney's fees to a prevailing defendant in a

*qui tam* action if the court "finds that the claim of the person bringing the action was clearly

frivolous, clearly vexatious, or brought primarily for the purposes of harassment."  31 U.S.C.

§ 3730(d)(4).  A claim is frivolous if it has "no arguable support in existing law or in any

reasonably based suggestion for its extension."  <u>United States ex rel. Bain v. Georgia Gulf Corp.</u>,

208 Fed. Appx. 280, (5th Cir. 2006)(a single jurisdictional or procedural defect may merit a ruling

on frivolousness or vexatiousness).  A claim is "vexatious when the plaintiff brings the action for an

improper purpose, such as to annoy or harass the defendant … and either of these grounds is

independently sufficient to support an award of attorney's fees under § 3730(d)(4)."  <u>Id.</u>  The

Second Circuit has clarified that a relator's subjective bad faith is not an element under § 3730(d)(4) and that there can be an award of attorney's fees upon a finding that the relator's claims are objectively frivolous, despite his subjective intent.  United States ex rel. Mikes v. Straus, 274 F.3d 687, 705 (2d Cir. 2001)("[s]ince plaintiff's allegations were bereft of any objective factual support, they clearly had no chance of success … [h]ence, an award of attorneys' fees to defendants was fully justified").  Here, Reynolds' overwhelming failure to establish subject matter jurisdiction and to satisfy the heightened pleading requirements of Rule 9(b) warrants a finding that his suit is frivolous and vexatious, and that an award of attorney's fees to the defendants is appropriate.  Id. See also Phipps, 152 F. Supp. 2d at 456 (allowing defendants to submit an application for attorney's fees, together with supporting arguments and backup documentation).

24

## V.    CONCLUSION

For all of the above reasons, this Court should dismiss Reynolds' *qui tam* lawsuit against the

defendants Simpson Gumpertz & Heger, Inc. and Computer Aided Engineering Associates.

Respectfully submitted,

**SIMPSON GUMPERTZ & HEGER, INC. and
COMPUTER AIDED ENGINEERING
ASSOCIATES, INC.**

By its attorneys,

/s/ David M. Pollack
David M. Pollack (DP6143)
DONOVAN HATEM LLP
One Penn Plaza
250 W. 34th Street, Suite 3324
New York, NY 10119
(212) 244-3333

David J. Hatem, P.C.
William D. Gillis, Jr., Esq.
Patricia B. Gary, Esq.
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500

Dated:  October 5, 2007

01118752 // 25550.144