Exhibit A

Jerry V. Leaphart #JL4468
Jerry V. Leaphart & Assoc., P.C.
8 West Street, Suite 203
Danbury, CT 06810
(203) 825-6265 – phone
(203) 825-6256 – fax
jsleaphart@cs.com

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DR. MORGAN REYNOLDS on behalf of the
UNITED STATES OF AMERICA,

     Plaintiff/Relator,

vs.

SCIENCE APPLICATIONS INTERNATIONAL
 CORP.; APPLIED RESEARCH ASSOCIATES, INC.;
BOEING; NuSTATS; COMPUTER
AIDED ENGINEERING ASSOCIATES, INC.;
DATASOURCE, INC.; GEOSTAATS, INC.;
GILSANZ MURRAY STEFICEK LLP;
HUGHES ASSOCIATES, INC.; AJMAL
ABBASI; EDUARDO KAUSEL;
DAVID PARKS; DAVID SHARP; DANIELE
VENEZANO; JOSEF VAN DYCK; KASPAR
WILLIAM; ROLF JENSEN & ASSOCIATES,
INC; ROSENWASSER/GROSSMAN CONSULTING
ENGINEERS, P.C.; SIMPSON GUMPERTZ &
HEGER, INC.; S. K. GHOSH ASSOCIATES,
INC.; SKIDMORE, OWINGS & MERRILL,
LLP; TENG & ASSOCIATES, INC.;
UNDERWRITERS LABORATORIES, INC.;
WISS, JANNEY, ELSTNER ASSOCIATES,
INC.; AMERICAN AIRLINES; SILVERSTEIN
PROPERTIES; and UNITED AIRLINES,

     Defendants.

FILED UNDER SEAL

QUI TAM COMPLAINT
and JURY DEMAND

DOCKET NO.  07 CIV 4612

May 31, 2007

The plaintiff/relator, Dr. Morgan Reynolds, plaintiff, by his attorney, Jerry V. Leaphart of Jerry V. Leaphart & Assoc., P.C. alleges as follows:

## I. NATURE OF ACTION

1.    The United States brings this action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33 and to recover all available damages and other monetary relief under the common law or equitable theories of unjust enrichment, payment under mistake of fact, recoupment of overpayments and common law fraud.

2.    These claims are based upon defendants' false claims and false statements made in and pursuant to certain reports, meetings, decision-making procedures, documentation, analyses of various types that resulted in accumulation of thousands of pages of text, reports, illustrations and graphic displays for which defendants received significant monetary compensation, all the while having overt and direct knowledge; and/or covert and indirect knowledge, or should have had such knowledge, that all such documentation was either false, fraudulent, a sham and/or designed to obfuscate the true and correct state of affairs that existed and that was hidden, as hereinafter articulated in detail. Recommendations and other contacts made with certain specified and otherwise duly empowered personnel and employees of that certain branch, agency or instrumentality of the United States Department of Commerce known as the National Institute of Standards and Technology (hereinafter generally referred to as NIST) were misled by the defendants' fraudulent acts and/or omissions.

3.    Under and pursuant to the National Construction Safety Team (NCST) Act, 15 USCS @ 7301, signed into law in October 2002, NIST was duly authorized to

2

investigate so-called building failures in the United States. The investigation of the destruction of the World Trade Center (WTC) complex occurring on September 11, 2001 began on or about August 21, 2002, with a budget of some sixteen million ($16,000,000) allocated for that purpose. The final report on the collapses of the 110-story, so-called Twin Towers of the WTC (hereinafter referred to jointly as WTC1, 2; and individually as WTC 1 and/or WTC2) was issued on or about October 26, 2005. Said report is entitled "Final Report on the Collapse of the World Trade Center Towers, and is commonly referred to as NCSTAR 1 (NCSTAR 1). NIST is still thought to be investigating the destruction of WTC building number 7 (WTC7), which was a 47-story skyscraper that inexplicably seemingly self-destructed in 6.6 seconds occurring at approximately 5:20PM on September 11, 2001, despite having not been visibly damaged by either any jetliner, missile or other object that would subject a modern, steel reinforced skyscraper to the danger of a complete, sudden and total disintegration, falling into its own footprint in less than seven seconds, which is almost tantamount to the time an object would take to fall from the height of WTC7 if it were free-falling in a vacuum, absent air resistance. NIST has not yet issued a report on the destruction of WTC7, but is relying on many of the same defendants herein named for purposes of the preparation of the report on WTC7. Upon information and belief, the ongoing conduct of NIST's investigation is or may be the subject of other legal proceedings that are likewise calling attention to the need for corrections in the approach taken in that investigation.

4.    During the course of its investigation of the destruction of WTC1,2, NIST caused to be issued certain "solicitations" resulting in the awarding of certain contracts under and pursuant to which each of the said defendants were to have provided

3

consulting and other services that would have enabled NIST to carryout its statutory mandate of "determining what caused the destruction of WTC1,2."

5.    Instead, however, defendants knowingly concealed, or failed to disclose, or caused others to fail to disclose material information in several reports filed in the public domain along with NCSTAR 1, and that comprise various sub-parts of NCSTAR 1, known as NCSTAR 1-1 through and including NCSTAR 1-8 and various subparts under each of the said NCSTAR 1-1 through and including NCSTAR 1-8 that, in the aggregate, constitute several thousand pages of text, documentation, graphical displays, simulations, charts and other documentation, all of which purported to satisfy, but intentionally did not satisfy, the mandate that NIST had, which was that of determining what cause the destruction of WTC1,2. Instead, all such documentation serves solely to mislead, obfuscate and provide a vehicle for the intended fraud; namely, that of steering NIST away from a consideration of what caused the destruction of WTC1,2; which, as elsewhere elaborated upon, was the use on 9/11/01 of exotic weaponry known as directed energy weapons.

6.    Indeed, NIST, at pg. xxxv-vi of NCSTAR 1 openly admits that its mandate was to "determine why and how WTC1 and WTC2 collapsed following the initial impacts of the aircraft and why and how WTC 7 collapsed". But, shortly thereafter and at pg. xxxvii of NCSTAR 1, NIST acknowledges that it did not "determine why and how WTC1 and WTC2 collapsed following the initial impacts of the aircraft and why and how WTC 7 collapsed" but, instead, NIST openly narrowed and limited its stated mandate of NCSTAR 1 at the behest and based upon the fraud perpetrated by defendants resulting in the inexplicable narrowing of NCSTAR 1's mandate as follows:  "[T]he

4

focus of the Investigation was on the sequence of events from the instant of aircraft impact to the initiation of collapse for each tower. For brevity in this report, this sequence is referred to as the 'probable collapse sequence', although it includes little analysis of the structural behavior of the tower after the conditions for collapse initiation were reached and collapse became inevitable". That innocuous sounding admission that NIST did not carry out its statutory function or mandate was caused by fraud and deceit and is the subject of this Qui Tam lawsuit.

7. Relator, in a Request for Correction dated March 8, 2007 (hereinafter generally referred to as March 8 RFC), copy annexed as Exhibit A, challenged NCSTAR 1 in its entirety based on the Data Quality Act Section 515 Public Law 106-554 and based on NIST's admitted failure to determine what caused the destruction of WTC1,2, and further based on the submittal of proof that the actual cause was obfuscated by use of false, misleading and fraudulent simulations seemingly showing how hollow, aluminum aircraft could impact with structural steel and nonetheless, glide right through such steel structures (WTC1,2) from nose to end of its tail and wing to wing and leave an airplane shape, no less, all as though this event were a cartoon much like the Roadrunner; or much like a hot knife through butter. Such simulations violate the Data Quality Act and the False Claims Act and relator herein has so asserted.

8. In the March 8 RFC and in Supplement No. 1 to said March 8 RFC that was filed with NIST on April __, 2007, Relator indicated that fraud had been committed in that NCSTAR 1 was a fraudulent document, resulting from the acts and omissions of NIST participants, including the defendants herein; and/or in other respects, was fraudulent for ignoring, disregarding and/or intentionally concealing abundant evidence

5

confirming that the conclusions contained in NCSTAR 1 were untenable, incomplete and incongruent with the facts at hand; in other words: fraudulent.

9.    Although the March 8 RFC is a comprehensive document detailing exactly how, in what manner and for what reasons NCSTAR 1 is fraudulent, and should therefore be read in its entirety in conjunction with the claims of fraud made herein, it can be said that in the main, NCSTAR 1 is fraudulent because it intentionally conceals the fact that the buildings known as the Twin Towers of the World Trade Center Complex, World Trade Center 1 and World Trade Center 2 were not hit by Boeing 767 jetliners and all such claims to that effect are glaringly and obviously blatantly false and are indeed, a manifested psychological operation ("psy op") of the type that one or more of the defendants herein, including, without limitation, SAIC, specialize in.

10.    Upon information and belief, such psy ops are and remain highly classified, secret instrumentalities of the military apparatus of the Armed Forces of the United States of America. Some of the defendants are known manufacturers, developers, implementers, testers, and researchers or are otherwise participants in either the development of psy ops or the concealment of their true nature and capacities from the general public. Much of the secrecy apparatus under which psy ops are developed and were employed on September 11, 2001 (hereinafter generally referred to as 9/11/01) may, in fact, fall outside the purview of the normal, legally mandated decisional and command structure of the Armed Forces of the United States of America and may, in fact, be rogue elements that are neither responsive to or even known to the lawful chain of command of the Armed Forces.

11.    It is in that manner that some 3000 deaths were inflicted upon the United

States of America on 9/11/01 based on fraud, apparent criminality and/or treason of a virtually unprecedented scale. This applies to both the events of 9/11/01 and to subsequent events that were justified upon the alleged commission of terror against the USA, when, in fact, the operation on 9/11/01 was in the nature of what is known as a "false flag operation" and what is also known as a "psychological operation" (psy op), of the type that some of the defendants herein, including, by way of non-exhaustive example, SAIC, engage in as a part of their business operations.

12.　In reporting as NCSTAR 1 did, that two 110 story skyscrapers, WTC1,2, disintegrated in less than 10 seconds each, leaving a debris field that was almost level with the ground and rarely rising more than one-story in height and where heavy gauge, high quality steel, which quality of steel is and was well known to some defendants, including by way of non-exhaustive example, Underwriters Laboratories, was turned to dust before our very eyes and to claim, as NCSTAR 1 did, that the process seen was the "inevitable" result of plane damage, kerosene-based fire (jet fuel is a form of kerosene with certain additives) and gravity, defies logic, common sense, and scientific reasoning and rationale of the type that NIST was mandated to provide and that defendants were required to assist in, based on their individual and collective expertise, which constituted the basis for their selection as contractors and which resulted in the receipt by them of the payments that should not have been made and that should now be recovered, with interest and penalties under the False Claims Act.

13.　Instead, defendants, and each and every one of them, especially those among them who are developers of psy ops, including by way of non-exhaustive example, SAIC and ARA, committed fraud in seeking to have NCSTAR 1 deceive the

7

public into not recognizing that WTC1,2 could not reasonably or possibly have been hit by jetliners in the manner depicted in some (but not other TV feeds) absent the use of psy ops. Some of the defendants knew as much; other defendants either knew or if they did not, they should have known as it is all but obvious that hollow aluminum cannot glide through reinforced steel. To the extent they did not know this, such ignorance was willful, intentional and actionable under the False Claims Act.

14.    As a result of defendants' false statements and false or fraudulent reports and other submissions issued or delivered to NIST during the course of NIST's investigation in the years 2002 to 2005, defendants wrongfully obtained payments from NIST which they knew or should have known they were not entitled to receive, by virtue of the fraud they were then and there committing.

15.    The causes of action alleged herein are timely brought on the basis of the filing of relator's complaint in this action within either six (6) years of the events of 9/11/01 or within two (2) years of the issuance by NIST of its final report entitled NCSTAR 1, which was issued in or about the month of October 2005, and wherein relator filed the March 8 RFC and the Supplement thereto in which relator provided specific original source information concerning the nature of the fraud committed and the capacity of certain of the defendants to have knowingly engaged in that fraud by virtue of either their participation in the manufacture of development of psy op perpetuated on 9/11/01 or other areas of expertise, such as, by way of non-exhaustive example, WJB's knowledge of structural steel and David Sharp's collection and analysis of that steel, and the lack of any identifiable aircraft debris, such that he and others knew that what was found could not have reasonably resulted from the effects of gravity, kerosene and/or

crash impact damage. By virtue of the collective and individual complicity of the defendants in the fraud that was perpetrated, such as expertise in psy ops, other defendants, like SAIC, all conspired to and did defraud both NIST and the public at large.

## II. JURISDICTION

16.     The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345 and supplemental jurisdiction to entertain the common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a). The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. §.3732(a) because at least one of the original defendants to this qui tam action resides or transacts business in the Southern District of New York and because the events that are the central component of the fraud that was committed are, or, rather, were, located in this district. Moreover, 28 U.S.C. § 1407 necessarily confers the jurisdiction of the Southern District of New York over the parties on this Court for this Multi-district proceeding.

## III. VENUE

17.     Venue is proper in the Southern District of New York, under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because at least one of the original defendants to this qui tam action resides or transacts business in that District.

## IV. PARTIES

18.     The United States brings this action on behalf of its Department of Commerce ("Commerce Department"), and its agency, the National Institute of Standards and Technology ("NIST"), which issued NCSTAR 1, one of the source documents in which the fraud alleged hereunder is to be found.

19.     Plaintiff and relator Dr. Morgan Reynolds is a citizen of the United States

9

and a resident of the State of Arkansas.. From approximately January 2006 through October 2006, Reynolds collected data and information and caused it to be published on his website for educational purposes which website is known as nomoregames.net. Reynolds caused to be published in or about the month of March 2006, his theory that the events of 9/11/01 that resulted in the utter, complete and total annihilation of the World Trade Center Complex, including WTC 1 and 2 as well as all other buildings having a WTC prefix were falsely depicted as having involved jetliners and that instead, no jetliner hit WTC1,2.

20.    A Disclosure Statement in text and digital form has been delivered to the office of the Attorney General with copy to the U.S. Attorney for the Southern District of New York, containing copious data further detailing and substantiating the assertions that the apparent airliner images are but the manifestation of a psy op.

21.    Defendant Science Applications International Corporation (SAIC) is a publicly traded company which has its principle office at SAIC Headquarters, 10260 Campus Point Drive, San Diego, CA 92121. It has offices in 150 cities worldwide. It describes itself as "one of the largest science and technology contractors to the U.S. Government" and provides services and products for "all branches of the U.S. military, agencies of the U.S. Department of Defense (DoD), the intelligence community, the U.S. Department of Homeland Security (DHS) and other U.S. Government civil agencies". In January 2005, SAIC was awarded an Air Force Research Laboratory Contract for High Power Microwave Program (http://www.saic.com/news/2005/jan/03.html). In 2005, SAIC also ran chemical oxygen iodine laser (COIL) at a branch of the Air Force Research Laboratory in Albuquerque, NM ((http://www.saic.com/news/saicmag/2005-

fall/directedenergy.html).  SAIC also engages in psy ops of the type that are intended to mislead the publics of targeted countries in furtherance, it would appear, of the Hobbesian principal that "in war force and fraud are the cardinal virtues".  Be that as it may be from a philosophical perspective, embodying, as it does, the more commonly expressed one that "might makes right", the False Claims Act, by its terms, prohibits the use of fraud in the preparation of governmental documents and the provision of governmental services.  SAIC engaged in fraud, then, in the wrong place and in the wrong context.  Between ARA and SAIC, some twenty-five (25) persons were assigned to work on, by literally surrounding and, accordingly, controlling and manipulating, NIST officials such that fraud, the intended outcome, did, in fact, occur.  It is telling that the two contractors who were most numerous among NIST's contractors were those whose primary expertise includes the development of Directed Energy Weapons (DEW) and psychological operations (psy ops), as that term is understood for military and warfare purposes, respectively.  Small wonder, then, that NIST did not investigate what caused the destruction of WTC 1,2; namely, DEW, carried out in the manner of a psy op.

22.    Defendant Applied Research Associates Inc. (ARA) is an "employee owned" corporation having its principal office and place of business at 4300 San Mateo Blvd. NE • Suite A-220 • Albuquerque, NM 87110 that currently operates ARA 73 offices in the United States and in Canada, some of which have classified computing and storage and military applications abbreviated as:

- SEI CMMI Certification
- SCIF facilities
- SIPRNET access

ARA also has:

11

- <u>Manufacturing/prototyping facilities</u>
- <u>Laboratories</u>
- <u>Testing facilities</u>

located in various states, including, without limitation, the States of Vermont, Florida, Colorado and Texas. ARA, upon information and belief, manufactures or causes to be manufactured, develops and/or tests DEW that are operational in Earth orbit, at high altitude, low altitude, at sea and on land ranging in lethality from the capacity to do great damage, such as that of destroying the World Trade Center Twin Towers in less than 10 seconds each, as occurred on 9/11/91, down to and including imposition of a disabling stun on human beings for crowd control and/or other psy op purposes.

23.    Defendant Boeing is a publicly traded company that has its corporate offices at Boeing Corporate Offices, 100 North Riverside, Chicago, IL 60606 (312-544-2000). It has offices in 70 countries. One of its companies is Boeing Integrated Defense Systems – the world's second largest defense company, which provides end-to-end services for air, land, sea, and space-based platforms for global military, government and commercial customers. In January 2006, Boeing was awarded an Air Force Contract for Directed Energy and Space Surveillance Research & Development, (http://www.boeing.com/news/releases/2006/q1/060116c_nr.html), including, by way of example, significant involvement in the development of the so-called Airborne Laser (ABL) that serves as a platform for the use of High Energy Lasers (HEL) that, upon information and belief, have the capacity to pulverize steel, destroy buildings in mere seconds, as happened to WTC 1,2 on 9/11/01.

24.    Defendant NuStats is a full-service survey research and consulting firm, with more than 40 social scientists, research managers and technical specialists in their

12

Austin, TX and Alexandria, VA offices. Its head office is at 3006 Bee Caves Road, Suite A300, Austin, TX 78746. NuStats is performing or has performed statistical research in the areas of education, transportation and on behalf of the Environmental Protection Agency. It is owned by the PTV group (http://www.ptv.de/). The services of this defendant include those of marketing, opinion sampling and focus group exercises designed, in the aggregate, to form, modulate, moderate and ultimately to manipulate public opinion. In other words, services ancillary to psy ops. NCSTAR 1 bears the hallmarks of a marketing device, not a scientifically derived forensic study as mandated by its enabling legislation.

25. Defendant Computer Aided Engineering Associates, Inc. is a privately held company that provides services in design and concept validation for such areas as Stress Analysis and Heat Transfer. It has its principle office at 1579 Straits Turnpike, Suite 2B, Middlebury, CT 06762 (310-393-9999). Its clients include the U.S. Army, U.S. Navy and Lockheed Martin Defense Systems. It is listed as a signatory to an agreement which the U.S. Army Armament Research, Development and Engineering Command (ARDEC) (under the umbrella of National Small Arms Technology Consortium-NSATC), where one of the listed future objectives: "4.3 Future Advanced Ground Combat Systems" is the "development and demonstration of agile target effects through such techniques as directed energy". (http://www.pica.army.mil/nsac/Final%200TA%2018%Jan%2005BarbandDonna.doc).

26. Defendant DataSource, Inc. is a privately held company that provides services in IT project outsourcing, consulting, and project management services and systems integration. It has its principle office at 7500 Greenway Center Drive, Suite 420,

13

Gr...
Lc...
are...
inv...
glic...
oth...

...01-441-2357. The Internal Revenue Service, U.S. Naval Sea
...nt Atlantic (NAVSEA) and the U.S. Department of Treasury
...defendant directly participates in steering the NIST
...:sessment of the evidence that jetliners could not possibly have
...to wingtip through WTC1,2 without deformation, debris or
...iated with airliner impacts with buildings..

"hig...
coll...
Geo...
locat...
used...

...GeoStats, Inc. is a privately held company which provides
...ing services for transportation projects that require the
...ccurate spatial and temporal data". Its products include
...d practical in-vehicle GPS data collection solution. Its office is
...t, NW, Suite 310, Atlanta, GA 30318. That expertise was
...the preparation of NCSTAR 1.

corpc...
Floo!...
inclu...
such...
engir...
techn...
const...
(railr...
Broo!...
exper...

...Gilsanz Murray Steficek LLP is an "employee owned"
...ipal office and place of business at 129 West 27th Street 5th
...)1, also with offices in NJ and CA. Some of their services
...buildings, bridges, and towers and also Specialty Services
...and Blast Resistant Design. They contribute to the structural
...ugh involvement in professional societies and by publishing
...:tructural design. They have performed renovations/
...ures including Hoboken Terminal & Yard, Hoboken, NJ
...support buildings and bridges), 11 MetroTech Center,
...omputer operations). Their individual and collective
...mployers, could have been, but was not, used for purposes of

14

calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 could not have been caused by jetliner impacts. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

29.    Defendant Hughes Associates, Inc. (HAI) was founded in 1980 and is a global company with leading fire protection consultants and engineers, and fire investigators that specialize in fire testing, fire modeling, and fire protection design. Through state of the art fire engineering, modeling and testing, HAI's engineers and consultants lead the fire safety and protection engineering industry.  Headquartered in Baltimore, MD (3610 Commerce Drive, Suite 817, Baltimore, MD 21227, HAI has offices throughout the U.S. and overseas with an office located in New York, New York. Their individual and collective expertise, and that of their employers, could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 could not have been caused by jetliner impacts. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

30.    Defendants independent contractors, Ajmal Abbasi, Eduardo Kausel, David Parks, David Sharp, Daniele Veneziano, Josef Van Dyck and Kaspar William, each and all  participated in the work resulting in NCSTAR1, including, by way of example, review of steel remnants from WTC1,2 that clearly showed effects such as ablating, wilting, melting and molecular dissociation, all of which are utterly inconsistent with a kerosene-based fire, that could not have been caused by a jetliner crash.  Their individual and collective expertise, and that of their employers, could have been, but was

15

not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 could not have been caused by jetliner impacts. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

31.    Defendant Rolf Jensen & Associates, Inc. (RJA) is a company of fire protection and security consultants, registered with the General Services Administration and working closely with the federal government, providing professional engineering consulting services, products and programs. Its corporate headquarters is located in Addison TX (16633 Dallas Parkway, Suite 600, Addison, TX 70001), with additional offices throughout the U.S. and abroad including an office located at 360 W. 31st Street, Suite 900, New York, NY 10001. Since its inception (1969) it has earned the right to participate on many of the world's leading projects. For the World Trade Center project, RJA teamed up with S.K. Ghosh Associates, Inc. (SKGA) and Rosenwasser/Grossman Consulting Engineers, P.C. (RG). Their individual and collective expertise, and that of their employers, could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 could not have been caused by jetliner impacts. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

32.    Defendant Rosenwasser/Grossman Consulting Engineers, P.C.'s president, Jacob S. Grossman, has been involved in the design of over 1000 steel and concrete buildings since 1957, three of these buildings are among the 100 tallest in the world. Mr. Grossman was a technical consultant to the Applied Technology Council for the

development of "NEHRP Guidelines for the Seismic Rehabilitation of Buildings". It has been involved in "participation with government agencies, including FEMA and NIST, and reviewing and improving design details that will protect against terrorist activity". The corporation's main address is 132 W. 36th at 6th Avenue, New York, NY 10018. It is a privately held company. Their individual and collective expertise, and that of their employers, could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 could not have been caused by jetliner impacts. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

33.    Defendant Simpson Gumpertz & Heger Inc. is privately held ENR 500 consulting/engineering firm that applies advanced engineering to buildings, infrastructure and special structures. Founded in 1956, their practice encompasses the design, investigation and performance evaluation and repair and rehabilitation of constructed works. Their New York office is located at 19 W. 34th Street, Suite 1000, New York, NY 10001. Its list of clients include the U.S. Army Corps of Engineers, the U.S. Department of Justice and U.S. General Services Administration. Their individual and collective expertise, and that of their employers, could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 could not have been caused by jetliner impacts. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

34.    Defendant S.K. Ghosh Associates, Inc., a privately held company, is

17

involved in the development of seismic design code provisions for national model building codes and standards including ASCE 7 Standard for Minimum Design Loads for Buildings and ACI 318 Building Code Requirements for Structural Concrete. Its main office is located at 334 E. Colfax Street, Palatine, IL 60067. Its clients include the Building and Fire Research Laboratory (part of NIST). Their individual and collective expertise, and that of their employers, could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 could not have been caused by jetliner impacts. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

35.    Defendant Skidmore, Owings & Merrill, LLP (SOM) was founded in 1936, and is one of the world's leading architecture, urban design, engineering, and interior architecture firms. Its New York office is located at 14 Wall Street, 24th Floor, New York, NY 10005. Their individual and collective expertise, and that of their employers, could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 could not have been caused by jetliner impacts. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

36.    Defendant Teng & Associates, Inc., a Chicago-based engineering firm with its corporate office located at 205 N. Michigan Ave., Suite 3600, Chicago, IL 60601, and its New York office located at 350 Northern Boulevard, Suite 323, Great Neck, NY 11021-4809. The firm offers a full range of services including architectural

design, urban design, planning, civil, structural, mechanical, plumbing, electrical and technology engineering, as well as full-service, integrated design/build services for America's fastest growing business segments. Their individual and collective expertise, and that of their employers, could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 could not have been caused by jetliner impacts. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

37. Defendant Underwriters Laboratories, Inc. Underwriters Laboratories Inc. (UL) is an independent, not-for-profit product safety certification organization that has been testing products and writing Standards for Safety for over a century. UL evaluates more than 19,000 types of products, components, materials and systems annually with 21 billion UL Marks appearing on 71,000 manufacturers' products each year. UL's worldwide family of companies and network of service providers includes 66 laboratories, testing and certification facilities serving customers in 104 countries. Its corporate headquarters is located at 33 Pfingsten Road, Northbrook, IL 60062-2096. Their individual and collective expertise, and that of their employers, could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 could not have been caused by jetliner impacts. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly. Said defendant not only knew that the quality of steel used in the construction of WTC1,2 should not have been significantly harmed or weakened by the stated combined effects of

19

crash damage, fire and/or gravity, it overtly suppressed such information by terminating the services of one of its employees, Kevin Ryan, who called attention to that incongruity of causal explanation. Nonetheless, defendant then proceeded to engage in further fraud and deception by intentionally ignoring and/or manipulation of information that knew, or should have, that WTC1,2 were destroyed by means other than those stated in NCSTAR 1.

38.    Defendant Wiss, Janney, Elstner Assoicates, Inc. (WJE) has its principal place of business at 330 Pfingsten Road, Northbrook, Illinois 60062 and is engaged in a wide range of structural and materials testing services. Their individual and collective expertise, and that of their employers, could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 could not have been caused by jetliner impacts. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly. This defendant also analyzed steel remnants, including some showing obvious indicators of a degree of deformation, of destruction, of ablation and/or of molecular dissociation that could not have resulted from fire, gravity or crash damage, singularly, or in the aggregate. Yet, said defendant continued to commit and/or to allow fraud to occur, by allowing the assertion that steel could be destroyed in the manner they saw, observed, catalogued and otherwise documented by brief, uncontrolled exposure to kerosene-based fire. Kerosene, a middle distillate, combustible fuel, upon information and belief, physically cannot attain even a high fraction of the temperature needed to deform steel in the manner WJE knew to have existed. Thus, WJE committed fraud.

39.    Defendant American Airlines is a division, subsidiary and/or brand name of AMR Corp., with a headquarters or principal office located at 4333 Amon Carter Boulevard, Fort Worth, TX 76155. American Airlines had one or more aircraft that were said to have been involved in the events of 9/11/01 and American Airlines then consulted with NIST in the preparation of NCSTAR 1. Their individual and collective expertise, and that of their employers, could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 could not have been caused by jetliner impacts. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

40.    Defendant Silverstein Properties has an office or place of business at 250 Greenwich Street, 38th Floor New York City, NY 10007 and holds a leasehold interest in and to the site where WTC1,2 stood. As such, this defendant had a clear conflict of interest in steering the investigation away from any hint, suggestion, much less conclusion that jetliners did not impact or have any bearing upon the destruction of WTC1,2 and the rest of the World Trade Center complex. Indeed, one anomaly that should be a hint that something is amiss is that all buildings having an address prefix of "World Trade Center," namely buildings 1 through and including 7, were all completely and utterly destroyed on 9/11/01. Yet, for as horrific as that destruction was, virtually all other buildings in the area, some having a spatial relationship that was as close or nearly so as the WTC buildings were, one to the other, were not damaged very much at all, relatively speaking. Upon information and belief, Silverstein Properties benefited from an insurance claim relating to the events of 9/11/01. Upon information and belief, at least

two of the insurers found to have been liable under their policies of insurance or of reinsurance with respect to this defendant, have, nonetheless, questioned the validity of the claim, based, in part, on the admission made by Larry Silverstein that WTC 7 was intentionally demolished, or words to that effect; and, further based on the as yet inadequate explanation of what did, in fact, cause the destruction of the World Trade Center complex. Upon information and belief, yet another presently pending action calls attention to the fact that a principal of this defendant, Larry Silverstein, has publicly admitted that WTC was intentionally demolished by using phrases that are to that effect. In that and in other ways, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly. Most assuredly, this defendant has a clear, palpable conflict of interest that would motivate it to manipulate and avoid any consideration that jetliners did not impact with WTC1,2 and that, instead, a psy op was carried out.

41.    Defendant United Air Lines, whose parent corporation is UAL Corporation, has its headquarters at 2 N. LaSalle Street, Chicago, IL 60602, with a mailing address of P.O. Box 66100, Chicago, IL 60666. United Airlines had one or more aircraft that were said to have been involved in the events of 9/11/01 and United Airlines then consulted with NIST in the preparation of NCSTAR 1. Their individual and collective expertise, and that of their employers, could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 could not have been caused by jetliner impacts. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

22

42.    Attached as Exhibit A and incorporated herein by reference, is a chart listing all parties who either contracted with or consulted with NIST in ways that are at issue in this action, hereinafter the "NIST participants."

## V. THE FALSE CLAIMS ACT

43.    The False Claims Act (FCA) provides, in pertinent part that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; . . . or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

* * * is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. See 31 U.S.C. § 3729(a) and (b).

## VI. THE NIST WTC INVESTIGATION

44.    In 2002, Congress enacted the National Construction Safety Team Act, 15 USC @ 7301, et seq.

45.    During the time period relevant to this complaint, NIST paid for consulting services on the basis of certain contracts and solicitation and on the basis of requisitions for the NIST participants' reported costs.

46.    Commerce Department is responsible for the administration and supervision of NIST. NIST, an agency of Commerce Department, is directly responsible for the WTC investigation program.

47.    During the course of the ongoing WTC investigation, including especially the time period of 2002 up to and including September of 2005, the NIST participants have submitted claims for payment to NIST arising under their various contracts and solicitations for services and/or reimbursement of expenses. The NIST participants received and are receiving payments on said claims.

48.    Cost reports are thought to exist that contain specific financial data

24

relating to the payments made by NIST to the NIST participants.

49.    All defendants are and were familiar with the law and regulations governing the WTC Investigation, including requirements relating to the submission of cost reports, accurate data, from either fraud or conflicts of interest and without violating the False Claims Act.

## VII. THE DEFENDANTS' SCHEME

50.    The destruction of the WTC on September 11, 2001, was caused, in whole or in part, by the use of Directed Energy Weapons, consisting in High Energy Lasers and or other operational, but largely secret weapons that are, nonetheless, known to exist and known to have been deployed and/or deployable in the year 2001, before and after.  It is also clear and apparent on its face that NIST's explanation of the destruction of WTC1,2, issued in or about the month of September, 2005, is blatantly false, incomplete, misleading and fraudulent.  As earlier stated, NIST first described its mandate, in words and substance, as that of determining what caused the destruction of WTC1,2.  Then by intentional and admitted modification and narrowing of the scope of that stated objective and mandate, NIST openly declined to carry it out.   That modification was at the behest and with the urging, backing and/or combined manipulative power of the defendants, acting singularly, collectively, overtly, covertly and otherwise.

—51.    Several of the defendants with whom NIST contracted for services in the preparation of NCSTAR 1 are, themselves, primarily engaged as defense contractors in a variety of disciplines, including, without limitation, very specific involvement in the use, development, manufacture, testing and or assessment of usability of directed energy weapons.  In other words, NIST contracted with those who have the greatest familiarity

with directed energy weapons in order to produce a report that sought to go to any length necessary to avoid, disguise, omit and otherwise divert attention away from the actual, real and intended destruction of the WTC complex by use of one device, namely directed energy weaponry, while pretending that the cause was the result of conditions that would be impossible based on the extent to which the NIST report, NCSTAR 1 violated both the laws of physics and common sense. By way of one example, NIST's NCSTAR 1 report found no piece of steel that had been subjected to a temperature higher than 600 degrees C, and most had not encountered a temperature of higher than 250 degrees C; yet, NIST offered no explanation whatever for the visual confirmation that most of the steel of the WTC complex was turned to dust and otherwise visibly subjected to a destructive process that could not conceivably have been caused by the effects, combined or otherwise, of jet fuel, gravity and/or damage from jetliner impacts.

52.    In point of fact, NIST, despite surrounding itself with contractors who are at the epicenter of that part of the military industrial complex that specializes in the production of directed energy weapons, in the dissemination of false news, so called psychological operations (psy ops) and who also specialize in public perception management programs, among other disciplines and areas of expertise that enabled, contributed to and/or facilitated the fraudulent scheme herein described and which has succeeded, thus far, in fraudulently presenting a false and misleading, fraudulent and illegal report on what caused the destruction on 9/11/01 of the WTC complex, and the receipt of improper payment in furtherance thereof.

53.    However, on March 8, 2007, relator, Dr. Morgan Reynolds, caused to be submitted a Request for Correction (RFC) that plainly stated that the WTC complex was

destroyed by use of directed energy weapons. Plaintiff, relator, Dr. Morgan Reynolds, in so doing, placed NIST on notice that false claims had been submitted to the government. Relator is, then, the original source of that claim and hereby reiterates that the WTC complex was destroyed on the basis of the use of directed energy weapons and all defendants knew or should have known this. Many of said defendants are involved in the manufacture of directed energy weapons as and for their primary business function.

## VIII. FALSE CLAIMS AND FALSE STATEMENTS TO NIST

54.    The various cost reports, requisitions, billing statements and/or requests for reimbursement submitted by the defendant NIST participants from and after 2002, through, at least, September, 2005, and, in many instances, continuing to the present, all contained false claims for reimbursement and made false statements to NIST concerning work performed by them and/or consulting services rendered to NIST because the true nature and intent was to mislead NIST and to cause a false causal statement concerning what caused the destruction of the WTC complex to occur.

55.    Exhibit B contains the following information regarding the false assertions that jetliners impacted WTC1,2:

a)    Complete, nearly intact penetration of the jet liner image into each tower and disappearance from exterior view, nose to tail (length of the aircraft) and wingtip to wingtip (width of aircraft);

b)    Nearly complete shredding and destruction of the jetliner image into small pieces inside each tower;

c)    Substantial aircraft debris exiting the building via each impact hole and the wall opposite each entry hole;

d)   No significant deceleration as each jetliner entered a tower.  In particular:

i).    Flight AA 11, according to NIST, hit WTC 1 flying at an estimated 443 mph yet its tail section disappeared (767 length = 159 feet) with 0.25 seconds, implying a minimum average airspeed of 434 mph traversing the initial 159 feet within the building, an insignificant drop of two percent despite massive resistance from a steel/concrete building.  A real jetliner would have encountered massive steel walls and steel floor pans-trusses-reinforced concrete floors immediately, as well as the dense steel core within 60 feet, drastically slowing the jetliner;

ii)    Flight UA 175 hit WTC 2, according to NIST, flying through thin air at an estimated 542 mph yet its tail section disappeared in 0.20 seconds, implying a minimum average airspeed of 542 mph traversing the initial 159 feet inside the south tower, that is, airspeed did not decrease despite resistance by the steel/concrete building.  A real jetliner would have encountered steel walls and concrete floors immediately, as well as the dense steel core within 37 feet and slowed drastically.

56.    Thus, in that manner, it is clear and apparent that NCSTAR 1 is false and misleading, on its face and as a result of the particular information set forth above and in Exhibit B.

57.    All NIST participants, defendants, knowingly filed or caused the filing of those false or fraudulent cost reports to get claims paid that should not have been paid, precisely because doing so resulted in the facilitation of the publication by NIST of a false, fraudulent and misleading causal report; namely NCSTAR 1, occurring in or about the month of October, 2005.

58.    All such submitted cost reports, invoices, reimbursement claims and the

like constitute false claims under the False Claims Act because the defendants knew they included costs that the actual cause of the destruction of the WTC complex was the result of the use of directed energy weapons.

## IX. DAMAGES

59.    The United States was damaged because of the acts of defendants in submitting or causing to be submitted of false claims, statements and records in that it was forced to pay the NIST participants for services rendered and related items and services that were all a part of a scheme to submit false and fraudulent information to NIST, resulting in the publication of a misleading, false and fraudulent report; namely, NCSTAR 1.

## FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))
(All Defendants)

60.    Plaintiff repeats and realleges each allegation in ¶¶ 1 through 58, as if fully set forth herein.

61.    The defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

62.    By virtue of the false or fraudulent claims made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each false claim.

29

## SECOND CAUSE OF ACTION

(False Claims Act: Making or Using False Record or Statement)
(31 U.S.C. § 3729 (a)(2))
(All Defendants)

63.     Plaintiff repeats and realleges each allegation in ¶¶ 1 through 62, as if fully set forth herein.

64.     The defendants, and each of them, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

65.     By virtue of the false records or statements made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each false claim.

## THIRD CAUSE OF ACTION

(False Claims Act: Reverse False Claims) (31 U.S.C. § 3729(a)(7))
(All Defendants)

66.     Plaintiff repeats and realleges each allegation in ¶¶ 1 through 65, as if fully set forth herein.

67.     The defendants knowingly made, used or caused to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States.

68.     By virtue of the false records or statements made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each false claim.

30

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment)
### (All Defendants)

69.    Plaintiff repeats and realleges each allegation in ¶¶ 1 through 68, as if fully set forth herein.

70.    This is a claim for recovery of monies by which the defendants have been unjustly enriched.

71.    By directly or indirectly obtaining government funds to which they were not entitled, the defendants were unjustly enriched, and are liable to account and pay such amounts, or the proceeds or profits there from, which are to be determined at trial, to the United States.

## FIFTH CAUSE OF ACTION

### (Payment by Mistake)
### (All Defendants)

72.    Plaintiff repeats and realleges each allegation in ¶¶ 1 through 71, as if fully set forth herein.

73.    This a claim for the recovery of monies paid by the Untied States to the defendants by mistake.

74.    .The United States, acting in reasonable reliance on the accuracy and truthfulness of the information contained in the cost reports submitted by defendants, paid the NIST participant defendants certain sums of money to which they were not entitled, and defendants are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

## SIXTH CAUSE OF ACTION

(Recoupment of Overpayments)
(All Defendants)

75.     Plaintiff repeats and realleges each allegation in ¶¶ 1 through 74, as if fully set forth herein.

76.     This is a claim for common law recoupment, for the recovery of monies unlawfully paid by the United States to the NIST participants defendants contrary to statute or regulation.

77.     The United States paid the NIST participants defendants certain sums of money to which they were not entitled. Defendants are thus liable under the common law of recoupment to account and return such amounts, which are to be determined at trial, to the United States.

## SEVENTH CAUSE OF ACTION

(Common Law Fraud)
(All Defendants)

78.     Plaintiff repeats and realleges each allegation in ¶¶ 1 through 77, as if fully set forth herein.

79.     All NIST participants defendants made material and false representations in the cost reports they submitted to NIST for payment and/or for reimbursement with knowledge of their falsity or reckless disregard for their truth, with the intention that the government act upon the misrepresentations to its detriment. The government acted in justifiable reliance upon defendants' misrepresentations by not only paying for the claimed services and the claimed entitlements to reimbursement, but also by incorporating the false, misleading and fraudulent data and conclusions into NCSTAR 1,

as intended by the NIST participants defendants.

80. Had the true facts been known to plaintiff, all defendants would not have received payment of any sum whatsoever, based on the nature and the extent of fraud committed by the NIST participants defendants.

81. By reason of having made such payments, plaintiff has been damaged in an as yet undetermined amount.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of it as follows:

1. On the First, Second, and Third, Causes of Action under the False Claims Act, against all defendants, for the amount of the United States' damages, multiplied as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2. On the Fourth, Fifth and Sixth Causes of Action, for unjust enrichment, payment by mistake, and common law recoupment against all defendants, for the damages sustained and/or amounts by which defendants were unjustly enriched or by which defendants retained illegally obtained monies, plus interest, costs, and expenses, for an accounting of such monies and such further relief as may be just and proper.

3. On the Seventh Cause of Action, for common law fraud against all defendants, for compensatory and punitive damages, together with costs and interest, and for such further relief as may be just and proper.

33

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demands a trial by jury on all the issues.

THE PLAINTIFF

By _____

Jerry V. Leaphart #JL4468
Jerry V. Leaphart & Assoc., P.C.
8 West Street, Suite 203
Danbury, CT 06810
(203) 825-6265 – phone
(203) 825-6256 – fax
jsleaphart@cs.com

Dated: May 31, 2007
        Danbury, CT

RECEIVED
MAR 1 2 2007
BY

Morgan Reynolds
26 Alta Way
Hot Springs Village, AR 71909
501-922-4592
econrn@mindspring.net

March 8, 2007

Request for Correction by NIST for Its Invalid WTC Jetliner
Animations and Analyses

The following *Request for Correction* is being e-mailed to the National
Institute of Standards and Technology on March 8, 2007. It will be
certified mailed on March 9, 2007. Attorney Jerry Leaphart has
informed me that he will work on additional legal papers as necessary.

March 8, 2007

VIA EMAIL AND CERTIFIED MAIL RRR
Chief, Management and Organization Division
National Institute of Standards and Technology
100 Bureau Drive, Mail Stop 3220
Gaithersburg, MD 20899-3220
Email: info.quality@nist.gov

Re: Request for Correction per Section 515 of Public Law
106-554

Dear Chief, Management and Organization Division:

This matter involves "information" that has been disseminated that
serves a useful purpose by insuring that the completed investigation of
what caused the jetliner-shaped holes in World Trade Center building
numbers 1 and 2 (WTC 1, WTC 2), otherwise known as the twin
towers, complies with data and information quality standards. For all of

ExA

the reasons set forth below in conjunction with specific requests for correction, such quality standards have been utterly and completely violated.

## Requester's Identity:

This request is submitted by Morgan O. Reynolds (requester).  My address, telephone number and email address are as set forth here:

Morgan O. Reynolds
26 Alta Way
Hot Springs Village, AR 71909
501-922-4592
econrn@suddenlink.net

In addition, Attorney Jerry V. Leaphart represents me in this matter.  I request that all subsequent replies be sent to both me and to my counsel whose contact information is set forth below.

## Basis for Request:

The requests for correction of information are submitted under Section 515 of Public Law 106-554.

The particular information disseminated that is the subject of the request consists in:

## Citation for Disseminated Information and Details:

The information is identified and known as "Final Reports of the Federal Building and Fire Investigation of the World Trade Center Disaster " http://wtc.nist.gov/oct05NCSTAR1-2index.htm dated as September 2005. (Also identified as Information Item No. II below).

The source from which requester obtained the information is the NIST

web site at the following pages:

I.
http://www.nist.gov/public_affairs/releases/wtc_briefing_april0505.htm

II. http://wtc.nist.gov/oct05NCSTAR1-2index.htm

III. http://wtc.nist.gov/oct05NCSTAR1-5index.htm

IV. http://wtc.nist.gov/NCSTAR1-5.pdf

V. http://wtc.nist.gov/NCSTAR1-2.pdf

VI. http://wtc.nist.gov/NCSTAR1-2B_Chaps1-8.pdf

VII. http://wtc.nist.gov/NCSTAR1-2B_Chaps9-11.pdf

VIII. http://wtc.nist.gov/NCSTAR1-6.pdf

The jetliner animations commissioned by NIST for airplane entry, penetration and fragmentation into WTC 1 and WTC 2, as well as its computer simulations and general analysis of jetliners at the WTC, purport to show and/or demonstrate the following conditions:

1. Complete, nearly intact penetration of the jetliner image into each tower and disappearance from exterior view, nose to tail (length of the aircraft) and wingtip to wingtip (width of aircraft).

2. Nearly complete shredding and destruction of the jetliner image into small pieces inside each tower.

3. Substantial aircraft debris exiting the building via each impact hole and the wall opposite each entry hole.

4. No significant deceleration as each jetliner entered a tower. In particular,

   a) Flight AA 11, according to NIST, hit WTC 1 flying at an estimated 443 mph yet its tail section disappeared (767 length = 159 feet) within 0.25 seconds, implying a minimum average airspeed of 434 mph traversing the initial 159 feet within the building, an insignificant drop of two percent despite massive resistance from a steel/concrete building. A real jetliner would have encountered massive steel walls andd steel floor pans-trusses-reinforced concrete floors immediately, as well as the dense steel core within 60 feet,

drastically slowing the jetliner.

b) Flight UA 175 hit WTC 1, according to NIST, was flying through thin air at an estimated 542 mph yet its tail section disappeared in 0.20 seconds, implying a minimum average airspeed of 542 mph traversing the initial 159 feet inside the south tower, that is, airspeed did not decrease despite resistance by a steel/concrete building. A real jetliner would have encountered steel walls and concrete floors immediately, as well as the dense steel core within 37 feet and slowed drastically.

These purported phenomena, as mentioned above and as described by NIST and its contractors, are not independently verifiable and do not have a scientifically valid basis for making the assumption that the simulated conditions could actually have occurred. Equally significant, the preparation of simulations that depict conditions that violate scientific principles serves only to mislead and to set the conditions for false conclusions to be enunciated. That is what has transpired and that is what must be corrected, all as more fully treated hereunder.

I will briefly demonstrate this request for correction as follows:

First consider item 4 above. A jetliner must decelerate at impact due to the laws of conservation of momentum and conservation of energy.[1] It is no different than a human springboard diver going

---

[1] Conservation laws, in physics, are basic laws that maintain that the total value of certain quantities remain unchanged during a physical process. Conserved quantities include mass (or matter), energy, linear momentum, angular momentum and electric charge. The theory of relativity combines the laws of conservation of mass and of energy into a single law. Additional conservation laws have meaning only on the subatomic level. Momentum, in mechanics, is the quantity of motion of a body. The linear momentum of a body is the product of its mass and velocity. Linear momentum of a body or system of bodies are conserved if no external force acts on it or them. The change in velocity (in magnitude and/or direction) of a body with respect to time is its acceleration or deceleration. The relationship between force ($F=mv$) and motion was expressed by Isaac Newton in his three laws of motion. *The Concise Columbia Encyclopedia*, Third Edition, 1994, pp. 200, 583.

through air and then decelerating as he pushes against the resistance of water. A flimsy, high-speed jetliner must decelerate sharply upon impacting a strong, massive fixed object like a skyscraper unless the jetliner acquires more energy from somewhere yet video evidence shows no deceleration of aircraft; no loss of momentum as it penetrates the tower.

NIST obviously incorporates the untested assumption that two jetliners could enter the twin towers and fail to decelerate during the first 159 feet of travel, the overall length of the jetliners. This assumption implies that all or most deceleration by each jetliner would occur within approximately the last 208'-159' = 49' in each tower, ignoring off-perpendicular lines of travel within a tower. The endpoints maintained by NIST are impossible (entry at 443 or 542 mph with average speed maintained for 159' in each tower, followed by deceleration to zero for most of each jetliner within the remaining approximately 49'). If kinetic energy and/or momentum did not decrease during the first 159' of tower penetration (implied by no deceleration), then each jetliner would have exited its tower, flying right through. It would be like a .357 magnum bullet fired through paper or 1 mm of balsa wood. As any such theory about jetliner impact with the twin towers is physically impossible, it is utterly improper for NIST and the supposedly sophisticated contractors it retained and paid to have utilized patently false physics so as to disregard the issue of deceleration as here shown to have been done.

All videos that "record" penetration by UA 175 into the south tower show no collision/crash and no deceleration. Instead, the jetliner image is "absorbed" by the building without deceleration; we just see a jetliner image glide into the tower and disappear without losing a flap, panel, wing tip or tail section.

Many of the available depictions of WTC 2 even show apparent "healing" of the structure as the jetliner penetrates. Some images show, for example, no break in the wall (no "scar" or column failure) after the wing section between the engine and fuselage passes into the building. The same impossible healing is true of the entire impact area.

As the conditions shown in such videos obviously violate several

laws of physics, of momentum and of energy, to such an obvious extent that professionals like those employed and hired by NIST must be deemed to know this, it follows that the information thus far disseminated to the public, and mentioned herein, is false, fraudulent and cannot be allowed to remain as is.

Videos that depict such impossibilities must be deemed to involve special effects of some kind for they almost certainly constitute fake "evidence" that should have been identified as such by a proper review of that information in the normal process of engaging in scientific "due diligence" that must be and is a prerequisite for issuance of reports that comport with the requirements of "data and information quality."

The assumptions concerning the laws of physics that are incorporated into the videos, as seen, are simply based upon impossible physics, rather like a "Road Runner" or "Tom & Jerry" cartoon. The analogy is both exact and obvious and should have been spotted. In addition, features like noiseless penetration of the towers despite noisy jet engines and other sounds on audio portions (screaming, etc.) prove fakery.

NIST violates quality standards by relying on fraudulent evidence and positing phenomena that violate elementary physics. NIST apparently failed to interview and document the photographers of each video, chains of custody (e.g., the Evan Fairbanks video allegedly was in the hands of the FBI on 9/11 for several hours and only a portion of the video was returned) and failed to investigate to insure no manipulation of pixels. For unknown reasons, NIST relied on obviously fraudulent data (e.g., faked videos) for its "analysis." If NIST engaged in conscious fraud, as is likely, the British would call it "fixing the intelligence to fit the policy."

Next, consider items 1-2 above. An aluminum jetliner cannot be invincible in one instant and fragile in the next instant, despite the proposed "creative" physics of NIST. Physics rejects any theory that posits an invincible jetliner (a jetliner remaining intact after an abrupt collision with a massive steel/concrete skyscraper) but also disintegrates (flimsy) in the next instant in the same general physical environment (temperature, etc.). An aluminum jetliner cannot push

through steel walls, steel-reinforced concrete floors, and a steel core of 47 cross-braced steel columns and disappear yet suddenly turn into shredded aluminum and other shredded materials. Yet the conditions here referenced are precisely those that are presupposed in, relied upon and/or incorporated into NIST findings and simulations referenced in this request for correction.

Virtually intact penetration is impossible because an aluminum jetliner is light and fragile and is not built to survive collisions with hundreds of thousands of tons of steel and concrete. Collisions are a matter of relative speeds—neither the jetliner nor the building "knows" which one is moving at 500+ mph and which one is standing still. Imagine that a WTC tower toppled over and into a Boeing 767 parked on the ground. What would happen? Despite slow speed of the tower, far below 500 mph, the "localized" area of the tower would crush the Boeing and the aircraft, in turn, would inflict little damage on the building. The difference is the vast discrepancy in mass of the two bodies.

Gashes in the towers, in addition, were too small to completely absorb the alleged aircraft. A Boeing 767 has a wingspan of 156 feet, wider than the gashes in either tower, about 126 feet at WTC 1 and 106 feet at WTC 2. Gash heights were short of the 45+ feet necessary to swallow a 767 tail section. To accommodate this problem, NIST relies on a "shredding" theory. NIST finds that the 767 fuselage (essentially a hollow aluminum tube), fuel-laden wings and engines caused complete failure of the steel walls (and floors) while the outer half of the wings damaged wall columns and belts but these wall sections did not fail. Allegedly the outer wings "shredded" against a web of steel and all wing material was carried into the buildings. This is impossible, as demonstrated here ("A Theoretical Shredding Mechanism" section in http://nomoregames.net/index.php?page=911&subpage1=we_have_holes). Steel wall sections that do not fail (fragment completely) would compress the wing, causing crumpling in the wing. Tearing must occur some distance from the steel columns and spandrel belts against which the jetliner metal crumples up. Barring any angular forces arising to spin pieces around columns and spandrel belts, all steel columns, steel spandrel belt and floor sections that were hit at the wall but did not fail must have rejected jetliner pieces and

bounced them outside each tower. We would expect even more debris compared to a fracture mechanism because shredding would hold back a considerable amount of material in large crumpled pieces rather than shattered fragments. Yet pictures and videos show no aircraft debris fell to the ground below the impact zones. Where is the evidence for the shredded wing halves? It does not exist. They could not have flown into the buildings after reflection by steel walls.

Item 3 is false since there was no aircraft debris showering down below the impact zone. Videos of the "glide-ins" and still pictures below the gashes support this conclusion. Nor is jetliner debris visible in the two gashes themselves. Nor has NIST or any other official investigation agency produced a single time-change part with its unique serial number from any of the alleged commercial aircraft of 9/11 matched against each aircraft's maintenance log to prove aircraft identity. Such identification is standard practice in aviation accidents and disasters. Further, thousands of pounds of jetliner debris posited by simulations supposedly located in the WTC plaza are unproven too.

The following quotations from NIST documents support the Request for Correction:

From V: "The aircraft impact response was dominated by the impact, penetration, and fragmentation of the airframe structures. The entire aircraft fully penetrated the tower at approximately 0.25 s.' p. lxxiv. "The wing structures were completely fragmented by the exterior wall...The aircraft was severely broken into debris as a result of the impact with the tower. At the end of the impact analysis, the aircraft was broke into thousands of debris fragments of various sizes and masses. Larger fragments still existed for specific components, such as the engines..." p. lxxvi

IV: "The speed of American Airlines Flight 11 as it entered the tower was estimated at 683 ft/s+/- 50 ft/s, or 466 mph +/- 34 mph." p. 9
On the same page, Table 2-1: "0.00 seconds Plane enters

tower...0.20 seconds Tail disappeared into building."
[Disappearance of a Boeing 767 within one-fifth of a second implies
an average airspeed in the building of 542 mph, so NIST here
implies that the alleged Flight 11 flew at 466 mph in thin air and then
sped up by 76 mph to 542 mph in the steel/concrete north tower.
This is impossible.]

V: Exec summary shows impact speeds of 443 +/- 30 mph for AA
11 and 542 +/-24 for UA 175, p. lxxiii.

VI: "A 500 mph engine impact against an exterior wall panel resulted in
a penetration of the exterior wall and failure of impacted exterior
columns. If the engine did not impact a floor slab, the majority of the
engine core would remain intact through the exterior wall penetration,
with a reduction in speed between 10 percent and 20 percent." p. xviii.
[Comment: A jet engine like a P&W is a dense 5-6 tons made of
stainless steel, titanium and other materials, and allegedly such engines
powered a 767 at 500+ mph into WTC 2 and at approximately 466 (or
443) mph into WTC 1. An engine would be the least likely item aboard
to slow down since fuselage, wings and tail sections would necessarily
encounter floor slabs while engines need not. The engines presumably
were at or near full power. Under power, the engines would be the last
items to decelerate. A proposed 10-20% deceleration of engines
contradicts the NIST overall conclusion of no-deceleration established
above. NIST "logic" once again fails mandated quality standards].

VI: The holes shown by NIST are undersized, that is, too small to
absorb a 767 intact. Pp. lxxi-lxxii and lxxviii.

V. "...The aircraft impact on WTC 1...the exterior columns were not
completely failed in the outer wing and vertical stabilizer impact
regions." p. xcxiii.

"Damage to the exterior wall extended to the wing tips, but the exterior
columns were not completely failed in the outer wing and vertical
stabilizer impact regions." xciii

"The analyses indicated that the wing structures were completely fragmented due to the interaction with the exterior wall, and as a result, aircraft fuel was dispersed on multiple floors." p. cxi

"The residual kinetic energy in the airframe components at the termination of the global impact simulation was less than one percent of the initial kinetic energy at impact." P. 173 (p. 287 of 462). [Comment: This statement implies termination within 208' despite little or no deceleration over the first 159+ feet. So these jetliners supposedly stopped in less than 50 feet at approximately 443 and 542 mph. Truly amazing!].

"The forward fuselage structures were severely damaged both from the penetration through the exterior columns and the interaction with the 96th floor slab that sliced the fuselage structures in half." P. 173 (p. 287 of 462). [Comment: yet no fuselage was visible in the gash or below the impact zone].

"By 0.2 s after impact, the wings completely penetrated the exterior wall, and only the tail structures were outside the tower…The wing structures were completely fragmented by the penetration through the exterior wall…" P. 173 (p. 287 of 462). [Comment: now full penetration at WTC 1 purportedly was completed at 0.25s instead of 0.20s].

Figure 7-4 "Entire aircraft inside tower at 0.24-.25 with 30 percent of initial momentum" for WTC 1 base case impact. P. 178 (p. 292 of 462). [Comment: loss of 70 percent of momentum during initial 159 feet contradicts no deceleration during disappearance of entire aircraft inside tower.].

"The calculated debris cloud included 17,400 lbs of debris and 6,700 lbs of aircraft fuel outside of the tower at the end of the impact analysis, either rebounding from the impact face (north wall) or passing through

the tower (south wall)." P. 190 (p. 304 of 462).

"By 0.2 s after impact, the full penetration of the aircraft into the tower was just completed. ... The airframe was mostly broken up, but some large sections of the aft fuselage and tail were still intact, having penetrated through the opening in the south wall produced by thke forward fuselage structures." P. 219 (p. 333 of 462).

Figure 7-35. "Normalized aircraft momentum for the WTC 2 base case impact" [entire aircraft inside tower at 0.2 s]. P. 224 (p. 338 of 462). [Comment: loss of 70 percent of momentum during initial 159 feet contradicts no deceleration during disappearance of entire aircraft inside tower.].

"Total aircraft debris outside tower: 55,800 lb, base case WTC 2 impact." P. 241 (p. 355 of 462). [Comment: NIST nor anyone else offers evidence of this phenomenon.]

"Aircraft debris total outside tower for the more severe WTC 2 impact: 121,000 lb." P. 258 (p. 372 of 462)

Fig. 7-70. "Landing gear (picture) found embedded in exterior panel knocked free from WTC 1." P. 274 (p. 388 of 462).

"The aircraft impact on WTC 1 resulted in extensive damage to the north wall of the tower, which failed in the regions of the fuselage, engine, and fuel-filled wing section impacts. Damage to the exterior wall extended to the wing tips, but the exterior columns were not completely failed in the outer wing and vertical stabilizer impact regions." P. 303 (p. 417 of 462). ) [The NIST Report claims ditto for The aircraft impact on WTC].

Appendix E, p. 340+ (p. 454 of 462):

WTC 1 videos (n=2):
The first is the Naudet brothers

The second WTC 1 impact video is from Pavel Hlavel 2001. All rights reserved]. P. 340 (p. 454 of 462).

WTC 2 videos (n=7):
p. 341 jetliner looks black, shaped like a 747, WABC-TV
p. 342 Michael Hezarkhan, looks like CNN shot, looks like AA livery, fuselage nose in WTC 2
p. 343 Park Foreman, very dark aircraft, darker than UA livery, with two shiny spots on starboard fuselage
p. 344 Scott Myers, AA livery with jetliner nearly overhead to left, on Liberty St. or block south of Liberty?
p. 345 Evans Fairbanks with jetliner overhead of FBI agent?
p. 346 WNBC jetliner seen from north
p. 347 WPIX-TV NYC "fractional" jetliner seen from east?, very dark, sun doesn't shine on it, wings and engines look amiss, wrong angle

VII. Landing gear at West and Rector found at the corner of West and Rector streets Figure 9-122 (Picture).
"Modeling uncertainties may also have contributed to the inability to predict the trajectory of specific aircraft components." P. 345 (p. 161 of 208).
[Comment: this landing gear is fabricated evidence as proven here: http://nomoregames.net/index.php?page=911&subpage1=trouble_with _jones#NBB].

## How Disseminated Information was obtained:

Requester obtained the information from and after March 1, 2007 from the said web pages and pdfs. It is understood and acknowledged that said information has been disseminated since September 2005. The data and analyses offered regarding jetliners impacting the twin towers are seriously impaired and misleading. This requires, at a minimum, the corrections set forth and requested hereunder.

## Explanation of how Requester Is affected:

Requester submits this request on behalf of himself and other similarly situated persons. Requester is a citizen of the United States, a professor emeritus and maintains a web site http://nomoregames.net for the accurate analysis and dissemination of information about the events of 9/11. Requester's business is in the nature of a research and educational enterprise that has succeeded in providing citizens of the United States with information concerning the function and the operation of various governmental agencies that are charged by their enabling legislation, rules and regulations of conducting certain duties in and for the public interest, of which and about which each citizen has a vital interest.

As indicated, this request is to be understood as being submitted by requester in his said capacity and either additionally or alternatively on behalf of other similarly situated persons who are too numerous to quantify or specifically name. Requester is adversely affected by the ongoing threat of promulgation of information that is in need of correction because the present course of action may result in the further concealment of serious wrongdoing. Requester is an "original source" of the analysis presented herein that demonstrates that false and misleading information has been presented as being accurate when plainly it is not.

Specifically, Information Item Nos. 1-4 fail to comply with applicable information quality guidelines and standards in a number of particular ways, including but not limited to the physical principles, facts and arguments stated above.

Requester asserts that the quoted information is demonstrably false and misleading and must be corrected, together with other information that, at present, also contains false and misleading statements.

By copy of this Correction Request to my counsel, Jerry V. Leaphart and Associates, P.C., I hereby request that he file such other and further requests for relief as may be suitable based on the original

source information submitted herein.

Respectfully submitted,

*Morgan O. Reynolds*

Morgan O. Reynolds

Cc
Jerry V. Leaphart
8 West Street
Suite 203
Danbury, CT 06810

Addendum:
ARA, as described below, appears to have been the principal contractor responsible for NIST aircraft impact analysis, as well as a current contractor for analysis of the destruction of WTC 7:

http://wtc.nist.gov/solicitations/wtc_awardQ0334.htm

## Contracts

## Awards

Under solicitation number SB1341-03-Q-0334, an indefinite deliverable, indefinite quantity (IDIQ) purchase order has been awarded to APPLIED RESEARCH ASSOCIATES, INC. (ARA) of Albuquerque, New Mexico:

ARA is an engineering firm that specializes in the following areas: nonlinear structural dynamics under blast and impact loading, vehicle crashworthiness and impact behavior, aircraft impact analysis, dynamic fracture modeling and failure analysis, impact and penetration mechanics, probabilistic engineering mechanics, and structural engineering. ARA is well qualified to conduct the analysis of the aircraft impact into the WTC towers with active research programs in crash, impact, and blast damage of structures for over 20 years. ARA is selected by the Federal Highway Administration as a Center of Excellence in finite element crash analyses and is designated by Livermore Software Technology Corporation (the

developer of the LS-DYNA software package) as a Research Collaborator. Specific examples of the team's past work include:

- Analysis of aircraft impact into nuclear power plant containment structures and storage containers.
- Analysis of a fighter aircraft impact into multiple reinforced concrete barriers.
- Fragmentation of aircraft components due to turbine rotor failure.
- Simulation of railcars in high-speed impacts.
- Studies of the effects of blast on buildings and their progressive collapse.

The specific tasks that ARA will perform include:

1) Provide estimates of the damage to structural systems due to aircraft impact – including exterior walls, floor systems, and interior core columns.
2) Provide estimates of the aircraft fuel dispersal during the impact.
3) Provide estimates and contours of accelerations and deformations as a function of time in each of the two towers due to aircraft impact to be used for estimating damage to fire proofing.
4) Provide a database of the major fragments of the aircraft and destroyed structural components of the towers to be used for estimating damage to the mechanical and architectural systems inside the towers.

The impact analyses will be conducted at various levels including: (1) the component level, (2) the subassembly level, and (3) the global level to estimate the probable damage to the towers due to aircraft impact. The analyses will also include simplified and approximate methods. Analysis of uncertainties using the component, subassembly, global, and simplified analyses will also be conducted to assess the effect of uncertainties associated with various parameters on the damage estimates.

The team from ARA combines engineers from several branches of ARA with diverse background and experience in crashworthiness, dynamic fracture analysis, applied mechanics and nonlinear dynamics, probabilistic mechanics, constitutive modeling, and structural engineering. The team is led by the three engineers with relevant backgrounds and appropriate knowledge in impact and crashworthiness studies. Select experience of these key project personnel is summarized below:

- Dr. Steven W. Kirkpatrick is the program manager for this project. Dr. Kirkpatrick is a senior engineer with 19 years of experience in vehicle crashworthiness, structural dynamics, finite element analysis, impact and penetration mechanics, and failure analysis. He has more than 80 publications in these areas. His research experience includes a wide

range of government and commercial projects for rail, highway, civil, military, and aerospace applications. He has been a program leader for many studies requiring close collaboration between experimental and computational efforts with emphasis on model validation. Dr. Kirkpatrick has a doctorate in mechanical engineering from Stanford University.

- Dr. B. Samuel Holmes is the program supervisor for this project. Dr. Holmes is a principal engineer with 40 years of experience in vehicle crashworthiness, structural dynamics, failure analysis, and fluid mechanics. He has served as a program manager and group leader for a variety of projects combining analysis and experiments. He acted as principal investigator for studies of train crashworthiness and the design of a crashworthy locomotive cab, and automobile accidents including compatibility and structural design for high speed impact, train aerodynamics, and impact. His experience also includes studies of weapons and blast effects on large structures. He has more than 40 publications in these areas. Dr. Holmes has a doctorate in applied mechanics from Drexel University.

- Dr. Justin Wu is the technical lead in performing the uncertainty analysis of this project. Dr. Wu is the director of probabilistic engineering at ARA. He is a renowned expert in probabilistic methods with 20 years of experience in the development and application of innovative physics-based probabilistic methods for a wide range of applications including structural reliability analysis and design of space shuttle, aircraft, offshore pipeline, power plant, and automotive; nuclear waste repository risk assessment, and hard target uncertainty analysis. Dr. Wu heads the development of ARA's ProFES (Probabilistic Function Evaluation System) software package, previously supported by the Air Force and NASA. He also leads the development of methodologies and software tools for hard target uncertainty analysis for DTRA, reliability-based multi-disciplinary design for NASA, and rotorcraft probabilistic damage tolerance analysis for FAA. He has more than 100 publications. Dr. Wu has a doctorate in mechanical engineering from University of Arizona.

Other key ARA team members include:
- Dr. Robert Bocchieri, Senior engineer, will provide expertise in constitutive modeling, rate-dependent material behavior, fracture mechanics and failure analysis, finite element analysis, structural dynamics, and crashworthiness. Dr. Bocchieri has a doctorate in aerospace engineering from the University of Texas at Austin.
- Dr. Lawrence A. Twisdale, Principal Engineer/Scientist, will provide expertise in structural engineering and building performance. Dr. Twisdale is a licensed professional engineer and has a doctorate in civil engineering from the University of Illinois.

Mr. Robert Frank, Principal Engineer/Scientist, will provide expertise in structural mechanics, structural dynamics, finite element analysis, and development and application of simplified response models. Mr. Frank is a licensed professional engineer and has a Master of Science degree in civil engineering from the Massachusetts Institute of Technology.

In addition, the ARA team is augmented by the following experts:
- Dr. P. V. Banavalkar, President of Ingenium Inc., will provide expertise in the analysis and behavior of high-rise steel structures. Dr. Banavalkar has over 40 years of project experience and ten of his building designs are listed in "100 of the World's Tallest Buildings" published in 1998 by the Council of Tall Buildings and Urban Habitat. His experience includes design for all conditions including critical seismic regions, blast-resisting structures and systems for prevention of progressive collapse. His notable projects include Library Tower in Los Angeles, Fountain Place in Dallas, Chase Tower in Houston, and U. S. Bank Place in Minneapolis. As a leading expert in his field, Dr. Banavalkar has authored more than 40 publications and lectured extensively on subjects such as steel structures, seismic stress, and concrete. Dr. Banavalkar is a licensed professional engineer and has a doctorate in civil engineering from Cornell University.
- Dr. Matthew H. Koebbe, independent consultant, will provide expertise in finite element modeling and automatic mesh generation, and nonlinear dynamics. Dr. Koebbe has a doctorate in Mathematics from the University of California, Santa Cruz.

# http://wtc.nist.gov/solicitations/
## Contracts
For more information, contact Joan Smith, 301-975-6458, joan.smith@nist.gov and Mike Szwed, 301-975-6330, michael.szwed@nist.gov.
- Detailed description of the selection process for external experts and contractors (New)
- Subscribe to the WTC mail list to receive notification on new contract solicitation postings and awards

# Awards

11
SB1341-03-Q-0334
R – Analysis of Aircraft Impacts Into the World Trade Center Towers
Applied Research Associates, Inc. (ARA)
9/23/2003
Award Information

17
SB1341-06-Q-0186
R – World Trade Center 7 Structural Models and Collapse Hypothesis
Applied Research Associates
3/31/2006
Award Information