# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
```

DR. JUDY WOOD on behalf of the
UNITED STATES OF AMERICA,                         :

      Plaintiff/Relator,                          :     <u>FILED UNDER SEAL</u>

                                                                               :

vs.                                               :

APPLIED RESEARCH ASSOCIATES, INC.;                :
SCIENCE APPLICATIONS INTERNATIONAL
CORP.; BOEING; NuSTATS; COMPUTER                  :
AIDED ENGINEERING ASSOCIATES, INC.;               :
DATASOURCE, INC.; GEOSTAATS, INC.;                :
GILSANZ MURRAY STEFICEK LLP;                      :  QUI TAM COMPLAINT
HUGHES ASSOCIATES, INC.; AJMAL                    :    and JURY DEMAND
ABBASI; EDUARDO KAUSEL;
DAVID PARKS; DAVID SHARP; DANIELE                 :  DOCKET NO.
VENEZANO; JOSEF VAN DYCK; KASPAR                  :
WILLIAM; ROLF JENSEN & ASSOCIATES,
INC; ROSENWASSER/GROSSMAN CONSULTING              :
ENGINEERS, P.C.; SIMPSON GUMPERTZ &               :
HEGER, INC.; S. K. GHOSH ASSOCIATES,             :
INC.; SKIDMORE, OWINGS & MERRILL,                 :
LLP; TENG & ASSOCIATES, INC.;                     :
UNDERWRITERS LABORATORIES, INC.;                  :
WISS, JANNEY, ELSTNER ASSOCIATES,                 :
INC.; AMERICAN AIRLINES; SILVERSTEIN              :
PROPERTIES; and UNITED AIRLINES,                  :

      Defendants.                                 :

```
-------------------------------------------------------------x
```

      The plaintiff/relator, Dr. Judy Wood, by her attorney, Jerry V. Leaphart of Jerry

V. Leaphart & Assoc., P.C. alleges as follows:



## I. NATURE OF ACTION

1.      The United States brings this action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33 and to recover all available damages and other monetary relief under the common law or equitable theories of unjust enrichment, payment under mistake of fact, recoupment of overpayments and common law fraud.

2.      These claims are based upon defendants' false claims and false statements made in and pursuant to certain reports, meetings, decision-making procedures, documentation, analyses of various types that resulted in accumulation of thousands of pages of text, reports, illustrations and graphic displays for which defendants received significant monetary compensation, all the while having overt and direct knowledge; and/or covert and indirect knowledge, or should have had such knowledge, that all such documentation was either false, fraudulent, a sham and/or designed to obfuscate the true and correct state of affairs that existed and that was hidden, as hereinafter articulated in detail.. Recommendations and other contacts made with certain specified and otherwise duly empowered personnel and employees of that certain branch, agency or instrumentality of the United States Department of Commerce known as the National Institute of Standards and Technology (hereinafter generally referred to as NIST) were misled by the defendants' fraudulent acts and/or omissions.

3.      Under and pursuant to the National Construction Safety Team (NCST) Act, 15 USCS @ 7301, signed into law in October 2002, NIST was duly authorized to investigate so-called building failures in the United States.  The investigation of the destruction of

the World Trade Center (WTC) complex occurring on September 11, 2001 began on or about August 21, 2002, with a budget of some sixteen million ($16,000,000) allocated for that purpose. The final report on the collapses of the 110-story, so-called Twin Towers of the WTC (hereinafter referred to jointly as WTC1, 2; and individually as WTC 1 and/or WTC2) was issued on or about October 26, 2005. Said report is entitled "Final Report on the Collapse of the World Trade Center Towers, and is commonly referred to as NCSTAR 1 (NCSTAR 1). NIST is still thought to be investigating the destruction of WTC building number 7 (WTC7), which was a 47-story skyscraper that inexplicably seemingly self-destructed in 6.6 seconds occurring at approximately 5:20PM on September 11, 2001, despite having not been visibly damaged by either any jetliner, missile or other object that would subject a modern, steel reinforced skyscraper to the danger of a complete, sudden and total disintegration, falling into its own footprint in less than seven seconds, which is tantamount to the time an object would take to fall from the height of WTC7 if it were free-falling in a vacuum, absent wind resistance. NIST has not yet issued a report on the destruction of WTC7, but is relying on many of the same defendants herein named for purposes of the preparation of the report on WTC7. Upon information and belief, the ongoing conduct of NIST's investigation is or may be the subject of other legal proceedings that are likewise calling attention to the need for corrections in the approach taken in that investigation.

4.    During the course of its investigation of the destruction of WTC1,2, NIST caused to be issued certain "solicitations" resulting in the awarding of certain contracts under and pursuant to which each of the said defendants were to have provided consulting and

3

other services that would have enabled NIST to carryout its statutory mandate of "determining what caused the destruction of WTC1,2."

5.      Instead, however, defendants knowingly concealed, or failed to disclose, or caused others to fail to disclose material information in several reports filed in the public domain along with NCSTAR 1, and that comprise various sub-parts of NCSTAR 1, known as NCSTAR 1-1 through and including NCSTAR 1-8 and various subparts under each of the said NCSTAR 1-1 through and including NCSTAR 1-8 that, in the aggregate, constitute several thousand pages of text, documentation, graphical displays, simulations, charts and other documentation, all of which purported to satisfy, but intentionally did not satisfy, the mandate that NIST had, which was that of determining what cause the destruction of WTC1,2.  Instead, all such documentation serves solely to mislead, obfuscate and provide a vehicle for the intended fraud; namely, that of steering NIST away from a consideration of what caused the destruction of WTC1,2; which, as elsewhere elaborated upon, was the use on 9/11/01 of exotic weaponry known as directed energy weapons.

6.      Indeed, NIST, at pg. xxxv-vi of NCSTAR 1 openly admits that its mandate was to "determine why and how WTC1 and WTC2 collapsed following the initial impacts of the aircraft and why and how WTC 7 collapsed".  But, shortly thereafter and at pg. xxxvii of NCSTAR 1, NIST acknowledges that it did not "determine why and how WTC1 and WTC2 collapsed following the initial impacts of the aircraft and why and how WTC 7 collapsed" but, instead, NIST openly narrowed and limited its stated mandate of NCSTAR 1 at the behest and based upon the fraud perpetrated by defendants resulting in the inexplicable narrowing of NCSTAR 1's mandate as follows:  "'[T]he focus of the

Investigation was on the sequence of events from the instant of aircraft impact to the initiation of collapse for each tower. For brevity in this report, this sequence is referred to as the 'probable collapse sequence', although it includes little analysis of the structural behavior of the tower after the conditions for collapse initiation were reached and collapse became inevitable. That innocuous sounding admission that NIST did not carry out its statutory function or mandate was caused by fraud and deceit and is the subject of this Qui Tam lawsuit.

7.    Relator, in a Request for Correction dated March 16, 2007 (hereinafter generally referred to as March 16, RFC), copy annexed as Exhibit A, challenged NCSTAR 1 in its entirety based on the Data Quality Act Section 515 Public Law 106-554 and based on NIST's admitted failure to determine what caused the destruction of WTC1,2, and further based on the submittal of proof that the actual cause was that of the use of directed energy weapons to bring on their destruction.

8.    In the March 16, RFC and in Supplement No. 1 to said March 16, RFC that was filed with NIST on March 29, 2007, and in Supplement No. 2 to said March 16, RFC that was filed with NIST April 20, 2007, Relator indicated that fraud had been committed in that NCSTAR 1 was a fraudulent document, resulting from the acts and omissions of NIST participants, including the defendants herein; and/or in other respects, was fraudulent for ignoring, disregarding and/or intentionally concealing abundant evidence confirming that the conclusions contained in NCSTAR 1 were untenable, incomplete and

incongruent with the facts at hand; in other words: fraudulent.

9.      Although the March 16 RFC is a comprehensive document detailing exactly how, in what manner and for what reasons NCSTAR 1 is fraudulent, and should therefore be read in its entirety in conjunction with the claims of fraud made herein, it can be said that in the main, NCSTAR 1 is fraudulent because it intentionally conceals the fact that the buildings known as the Twin Towers of the World Trade Center Complex, World Trade Center 1 and World Trade Center 2 were destroyed based, in whole or in substantial part, upon the use of Directed Energy Weapons (hereinafter generally referred to as DEW).

10.     Upon information and belief, DEW are and remain highly classified, secret instrumentalities of the military apparatus of the Armed Forces of the United States of America.  Some of the defendants are known manufacturers, developers, implementers, testers, and researchers or are otherwise participants in either the development of DEW or the concealment of their true nature and capacities from the general public.  Much of the secrecy apparatus under which DEW are developed and were employed on September 11, 2001 (hereinafter generally referred to as 9/11/01) may, in fact, fall outside the purview of the normal, legally mandated decisional and command structure of the Armed Forces of the United States of America and may, in fact, be rogue elements that are neither responsive to or even known to the lawful chain of command of the Armed Forces.

11.     It is in that manner that some 3000 deaths were inflicted upon the United States of America on 9/11/01 based on fraud, apparent criminality and/or treason of a virtually unprecedented scale.  This applies to both the events of 9/11/01 and to subsequent events that were justified upon the alleged commission of terror against the USA, when, in fact,

the operation on 9/11/01 was in the nature of what is known as a "false flag operation"

and what is also known as a "psychological operation" (psy op), of the type that some of

the defendants herein, including, by way of non-exhaustive example, SAIC, engage in as

a part of their business operations.

12.    In reporting as NCSTAR 1 did, that two 110 story skyscrapers, WTC1,2,

disintegrated in less than 10 seconds each, leaving a debris field that was almost level

with the ground and never rising more than one-story in height and where heavy gauge,

high quality steel, which quality of steel is and was well known to some defendants,

including by way of non-exhaustive example, Underwriters Laboratories, was turned to

dust before our very eyes and to claim, as NCSTAR 1 did, that the process seen was the

"inevitable" result of plane damage, kerosene-based fire (jet fuel is a form of kerosene

with certain additives) and gravity, defies logic, common sense, and scientific reasoning

and rationale of the type that NIST was mandated to provide and that defendants were

required to assist in, based on their individual and collective expertise, which constituted

the basis for their selection as contractors and which resulted in the receipt by them of the

payments that should not have been made and that should now be recovered, with interest

and penalties under the False Claims Act..

13.    Instead, defendants, and each and every one of them, especially those among

them who are manufacturers of DEW, including by way of non-exhaustive example,

ARA and SAIC, committed fraud in seeking to have NCSTAR 1 deceive the public into

not recognizing that WTC1,2 could not reasonably or possibly have been destroyed in the

manner seen absent the use of DEW.  Some of the defendants knew as much; other

defendants either knew or if they did not, they should have known.  To the extent they

did not know, such ignorance was willful, intentional and actionable under the False

Claims Act.

14.     As a result of defendants' false statements and false or fraudulent reports and

other submissions issued or delivered to NIST during the course of NIST's investigation

in the years 2002 to 2005, defendants wrongfully obtained payments from NIST which

they knew or should have known they were not entitled to receive, by virtue of the fraud

they were then and there committing.

15.     The causes of action alleged herein are timely brought on the basis of the filing of

relator's complaint in this action within either six (6) years of the events of 9/11/01 or

within two (2) years of the issuance by NIST of its final report entitled NCSTAR 1,

which was issued in or about the month of October 2005, and wherein relator filed the

March 16, RFC and the Supplement thereto in which relator provided specific original

source information concerning the nature of the fraud committed and the capacity of

certain of the defendants to have knowingly engaged in that fraud by virtue of either their

participation in the manufacture of DEW or other areas of expertise, such as, by way of

non-exhaustive example, WJE's knowledge of structural steel and David Sharp's

collection and analysis of that steel, such that he and others knew that the steel was

ablated, which is to say, melted, warped, subjected to molecular dissociation and in other

respects deformed and/or utterly disintegrated and turned to dust in a manner that could

not have reasonably resulted from the effects of gravity, kerosene and/or crash impact

damage, assuming _arguendo_ that crash damage occurred.  By virtue of the collective and

individual complicity of the defendants in the fraud that was perpetrated, such as

expertise in psy ops, other defendants, like SAIC, all conspired to and did defraud both

NIST and the public at large.  With respect to the assumption, granted for purposes of this complaint and this complaint only, that WTC1,2 were subjected to jetliner crashes, upon information and belief, another challenge to NIST is presently pending that asserts that no Boeing 767 jetliners crashed into WTC1,2 and that, instead, the illusion that such an event occurred is part and parcel of the psy op that was perpetrated on 9/11/01.  Herein below, the particular expertise of each of the defendants and how that expertise relates to the fraudulent enterprise they engaged in to foster the false reporting by NIST of the circumstances of the destruction of WTC1,2 will be set forth..

## II. JURISDICTION

16.     The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345 and supplemental jurisdiction to entertain the common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a). The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) because at least one of the original defendants to this qui tam action resides or transacts business in the Southern District of New York and because the events that are the central component of the fraud that was committed are, or, rather, were, located in this district.  Moreover, 28 U.S.C. § 1407 necessarily confers the jurisdiction of the Southern District of New York over the parties on this Court for this Multidistrict proceeding.

## III. VENUE

17.     Venue is proper in the Southern District of New York, under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because at least one of the original defendants to this qui tam action resides or transacts business in that District.

### IV. PARTIES

18.    The United States brings this action on behalf of its Department of Commerce ("Commerce Department"), and its agency, the National Institute of Standards and Technology ("NIST"), which issued NCSTAR 1, one of the source documents in which the fraud alleged hereunder is to be found.

19.    Plaintiff and relator Dr. Judy Wood is a citizen of the United States and a resident of the State of South Carolina.  From approximately January 2006 through October 2006, Wood collected data and information and caused it to be published on her website for educational purposes which website is known as janedoe0911.tripod.com and/or drjudywood.com.  Wood caused to be published in or about the month of October 2006, her theory that the events of 9/11/01 that resulted in the utter, complete and total annihilation of the World Trade Center Complex, including WTC 1 and 2 as well as all other buildings having a WTC prefix, with the possible exception of WTC 7  was brought about by use of directed energy weapons.  Upon information and belief, a separate challenge to NIST's conduct of its investigation of WTC 7 is presently pending.

20.    Annexed hereto as Exhibit B is a document written in the year 2000, at the behest of an agent of some of the defendants that describes the then current status of development of DEW.

21.    Annexed hereto as Exhibit C is a letter dated April 7, 2007, and sent to Susan L. Thornton of the Directed Energy Directorate (hereinafter referred to as the "Thornton letter") seeking additional confirmation, over and above the copious documentation and other evidence already compiled by relator, of the evidence presented by plaintiff/relator

herein, Dr Judy Wood, that DEW are a causal factor in the destruction of WTC1,2 on

September 11, 2001. It is understood and acknowledged that the Thornton letter could, in

the alternative, provide an opportunity for knowledgeable, responsible governmental

officials and/or non-governmental contractors who work on DEW, individually or

collectively, to come forward with evidence or information that asserts that the effects to

which relator attributes the use of DEW are not, in fact the result of DEW, but are caused

by something else. As of the date hereof, there has been no answer, either confirming or

qualifying, in some way or another, the DEW causal claim. Of course, and in point of

fact, by improperly and fraudulently curtailing the scope of its investigation, as NIST

admitted it had done, NIST has not offered any explanation whatsoever as to what caused

the utter destruction, pulverization, dustification and annihilation of WTC1,2. What

happened could not have been caused by kerosene, crash damage and/or gravity. To

assert otherwise violates the laws of physics and common sense; all as relator has

demonstrated with ample evidence. Relator's causal assertions were delivered to NIST

on March 16, 2007, supplemented first on March 29, 2007 and again on April 20, 2007,

and have not been either challenged, qualified or  contradicted by any source, to any

degree whatsoever. In addition, a Disclosure Statement in text and digital form has been

delivered to the office of the Attorney General with copy to the U.S. Attorney for the

Southern District of New York, containing copious data further detailing and

substantiating the assertions that DEW are a causal factor in the destruction of WTC 1,2

and that NCSTAR 1 is false, misleading and fraudulently derived.

22.    Annexed hereto as Exhibit D is a list of those who were sent a copy of the

Thornton letter that recipients include, without limitation, Clay Johnson III, Deputy

11

Director OMB. The copy sent to Clay Johnson III further specifically requested assurances that the persons from whom answers concerning the use of DEW were sought would not be subjected to security clearance procedures based on answering the queries posed in the Thornton letter; or, in the alternative, information on the procedures that would need to be followed to obtain answers to those queries. To date, Clay Johnson III has likewise not responded to relator's specific request addressed to him and has likewise, to relator's knowledge, not prohibited the recipients of the Thornton letter, including, without limitation, Susan L. Thornton, J.O. Miller, and others, from responding to it. A response should, therefore, be forthcoming or should be obtained in the course of the proceedings to be had hereunder.

23.    Defendant Applied Research Associates Inc. (ARA) is an "employee owned" corporation having its principal office and place of business at 4300 San Mateo Blvd. NE • Suite A-220 • Albuquerque, NM 87110 that currently operates ARA 73 offices in the United States and in Canada, some of which have classified computing and storage and military applications abbreviated as:

- SEI CMMI Certification
- SCIF facilities
- SIPRNET access

ARA also has:

- Manufacturing/prototyping facilities
- Laboratories
- Testing facilities

located in various states, including, without limitation, the States of Vermont, Florida, Colorado and Texas. ARA, upon information and belief, manufactures or causes to be manufactured, develops and/or tests DEW that are operational in Earth orbit, at high

altitude, low altitude, at sea and on land ranging in lethality from the capacity to do great damage, such as that of destroying the World Trade Center Twin Towers in less than 10 seconds each, as occurred on 9/11/01, down to and including imposition of a disabling stun on human beings for crowd control and/or other psy ops purposes.

24.    Defendant Science Applications International Corporation (SAIC) is a publicly traded company which has its principle office at SAIC Headquarters, 10260 Campus Point Drive, San Diego, CA 92121. It has offices in 150 cities worldwide. It describes itself as "one of the largest science and technology contractors to the U.S. Government" and provides services and products for "all branches of the U.S. military, agencies of the U.S. Department of Defense (DoD), the intelligence community, the U.S. Department of Homeland Security (DHS) and other U.S. Government civil agencies".    In January 2005, SAIC was awarded an Air Force Research Laboratory Contract for High Power Microwave Program (http://www.saic.com/news/2005/jan/03.html).  In 2005, SAIC also ran chemical oxygen iodine laser (COIL) at a branch of the Air Force Research Laboratory in Albuquerque, NM ((http://www.saic.com/news/saicmag/2005-fall/directedenergy.html).  SAIC also  engages in psy ops of the type that are intended to mislead the publics of targeted countries in furtherance, it would appear, of the Hobbesian principal that "in warre force and fraud are the cardinale virtues." Be that as it may be from a philosophical perspective, embodying, as it does, the more commonly expressed one that "might makes right", the False Claims Act, by its terms, prohibits the use of fraud in the preparation of governmental documents and the provision of governmental services.  SAIC engaged in fraud, then, in the wrong place and in the wrong context.  Between ARA and SAIC, some twenty-five (25) persons were assigned

13

to work on, by literally surrounding and, accordingly, controlling and manipulating, NIST officials such that fraud, the intended outcome, did, in fact, occur. It is telling that the two contractors who were most numerous among NIST's contractors were those whose primary expertise is in DEW and PSY OPS respectively. Small wonder, then, that NIST did not investigate what caused the destruction of WTC 1,2; namely, DEW, carried out in the manner of a PSY OP.

25.    Defendant Boeing is a publicly traded company that has its corporate offices at Boeing Corporate Offices, 100 North Riverside, Chicago, IL 60606 (312-544-2000). It has offices in 70 countries. One of its companies is Boeing Integrated Defense Systems – the world's second largest defense company, which provides end-to-end services for air, land, sea, and space-based platforms for global military, government and commercial customers. In January 2006, Boeing was awarded an Air Force Contract for Directed Energy and Space Surveillance Research & Development, (http://www.boeing.com/news/releases/2006/q1/060116c_nr.html), including, by way of example, significant involvement in the development of the so-called Airborne Laser (ABL) that serves as a platform for the use of High Energy Lasers (HEL) that, upon information and belief, have the capacity to pulverize steel, destroy buildings in mere seconds, as happened to WTC 1,2 on 9/11/01.

26.    Defendant NuStats is a full-service survey research and consulting firm, with more than 40 social scientists, research managers and technical specialists in their Austin, TX and Alexandria, VA offices. Its head office is at 3006 Bee Caves Road, Suite A300, Austin, TX 78746. NuStats is performing or has performed statistical research in the areas of education, transportation and on behalf of the Environmental Protection Agency.

It is owned by the PTV group (http://www.ptv.de/).  The services of this defendant include those of marketing, opinion sampling and focus group exercises designed, in the aggregate, to form, modulate, moderate and ultimately to manipulate public opinion.  In other words, services ancillary to psy ops.  NCSTAR 1 bears the hallmarks of a marketing device, not a scientifically derived forensic study as mandated by its enabling legislation.

27.     Defendant Computer Aided Engineering Associates, Inc. is a privately held company that provides services in design and concept validation for such areas as Stress Analysis and Heat Transfer.  It has its principle office at 1579 Straits Turnpike, Suite 2B, Middlebury, CT 06762 (310-393-9999).  Its clients include the U.S. Army, U.S. Navy and Lockheed Martin Defense Systems.  It is listed as a signatory to an agreement which the U.S. Army Armament Research, Development and Engineering  Command (ARDEC) (under the umbrella of National Small Arms Technology Consortium-NSATC), where one of the listed future objectives:  "4.3 Future Advanced Ground Combat Systems" is the "development and demonstration of agile target effects through such techniques as directed energy".

(http://www.pica.army.mil/nsac/Final%200TA%2018%Jan%2005BarbandDonna.doc). Accordingly, said defendant knew or should have that the visible effects resulting in the process of destruction of WTC1,2 and the residue from that destruction were consistent with the use of DEW.

28.     Defendant DataSource, Inc. is a privately held company that provides services in IT project outsourcing, consulting, and project management services and systems integration.  It has its principle office at 7500 Greenway Center Drive, Suite 420,

Greenbelt, MD 20770 (301-441-2357. The Internal Revenue Service, U.S. Naval Sea

Logistics Center Detachment Atlantic (NAVSEA) and the U.S. Department of Treasury

are listed as clients. This defendant directly participates in steering the NIST

investigation away from assessment of the evidence of DEW.

29.     Defendant GeoStats, Inc. is a privately held company which provides "highly-

specialized consulting services for transportation projects that require the collection and

analysis of accurate spatial and temporal data". Its products include GeoLogger™, a

simple and practical in-vehicle GPS data collection solution. Its office is located at 530

Means Street, NW, Suite 310, Atlanta, GA 30318. That expertise was used to perpetrate

fraud in the preparation of NCSTAR 1.

30.     Defendant Gilsanz Murray Steficek LLP is an "employee owned" corporation

having its principal office and place of business at 129 West 27th Street 5th Floor New

York . NY 10001, also with offices in NJ and CA. Some of their services include

Structural Design of buildings, bridges, and towers and also Specialty Services such as

Seismic Evaluation and Blast Resistant Design. They contribute to the structural

engineering community through involvement in professional societies and by publishing

technical papers relevant to structural design. They have performed

renovations/constructions to many structures including Hoboken Terminal & Yard,

Hoboken, NJ (railroad facilities, terminals, support buildings and bridges), 11 MetroTech

Center, Brooklyn, NY (NYPD 911 computer operations). That expertise could have

been, but was not, used for purposes of calling attention to the fact that the effects seen

and left by the pattern of destruction of WTC1,2 was caused by DEW. Instead, defendant

chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

31.    Defendant Hughes Associates, Inc. (HAI) was founded in 1980 and is a global company with leading fire protection consultants and engineers, and fire investigators that specialize in fire testing, fire modeling, and fire protection design. Through state of the art fire engineering, modeling and testing, HAI's engineers and consultants lead the fire safety and protection engineering industry.   Headquartered in Baltimore, MD (3610 Commerce Drive, Suite 817, Baltimore, MD 21227, HAI has offices throughout the U.S. and overseas with an office located in New York, New York.  That expertise could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 was caused by DEW.  Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

32.    Defendants independent contractors, Ajmal Abbasi, Eduardo Kausel, David Parks, David Sharp, Daniele Veneziano, Josef Van Dyck and Kaspar William, each and all  participated in the work resulting in NCSTAR1, including, by way of example, review of steel remnants  from WTC1,2 that clearly showed effects such as ablating, wilting, melting and molecular dissociation, all of which are utterly inconsistent with a kerosene-based fire, on one hand, but completely consistent with the effects of DEW, on the other.  Their individual and collective expertise, and that of their employers, could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 was caused by DEW.  Instead, defendant chose to use its expertise to commit fraud based on either withholding

17

information or manipulating information and by then accepting payment improperly.

33.    Defendant Rolf Jensen & Associates, Inc. (RJA) is a company of fire protection and security consultants, registered with the General Services Administration and working closely with the federal government, providing professional engineering consulting services, products and programs.  Its corporate headquarters is located in Addison TX (16633 Dallas Parkway, Suite 600, Addison, TX 70001, with additional offices throughout the U.S. and abroad including an office  located at 360 W. 31st Street, Suite 900, New York, NY 10001.  Since its inception (1969) it has earned the right to participate on many of the world's leading projects.  For the World Trade Center project, RJA teamed up with S.K. Ghosh Associates, Inc. (SKGA) and Rosenwasser/Grossman Consulting Engineers, P.C. (RG).  That expertise could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 was caused by DEW.  Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

34.    Defendant Rosenwasser/Grossman Consulting Engineers, P.C.'s president , Jacob S. Grossman, has been involved in the design of over 1000 steel and concrete buildings since 1957, three of these buildings are among the 100 tallest in the world.  Mr. Grossman was a technical consultant to the Applied Technology Council for the development of "NEHRP Guidelines for the Seismic Rehabilitation of Buildings".  It has been involved in "participation with government agencies, including FEMA and NIST, and reviewing and improving design details that will protect against terrorist activity".  The corporation's main address is 132 W. 36th at 6th Avenue, New York, NY 10018.  It is

18

a privately held company. That expertise could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 was caused by DEW. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

35.     Defendant Simpson Gumpertz & Heger Inc. is privately held ENR 500 consulting/engineering firm that applies advanced engineering to buildings, infrastructure and special structures. Founded in 1956, their practice encompasses the design, investigation and performance evaluation and repair and rehabilitation of constructed works. Their New York office is located at 19 W. 34th Street, Suite 1000, New York, NY 10001. Its list of clients include the U.S. Army Corps of Engineers, the U.S. Department of Justice and U.S. General Services Administration. That expertise could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 was caused by DEW. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

36.     Defendant S.K.Ghosh Associates, Inc., a privately held company, is involved in the development of seismic design code provisions for national model building codes and standards including ASCE 7 Standard for Minimum Design Loads for Buildings and ACI 318 Building Code Requirements for Structural Concrete. Its main office is located at 334 E. Colfax Street, Palatine, IL 60067. Its clients include the Building and Fire Research Laboratory (part of NIST). That expertise could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of

destruction of WTC1,2 was caused by DEW. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

37.    Defendant Skidmore, Owings & Merrill, LLP (SOM) was founded in 1936, and is one of the world's leading architecture, urban design, engineering, and interior architecture firms. Its New York office is located at 14 Wall Street, 24th Floor, New York, NY 10005. That expertise could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 was caused by DEW. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

38. Defendant Teng & Associates, Inc., a Chicago-based engineering firm with its corporate office located at 205 N. Michigan Ave., Suite 3600, Chicago, IL 60601, and its New York office located at 350 Northern Boulevard, Suite 323, Great Neck, NY 11021-4809. The firm offers a full range of services including architectural design, urban design, planning, civil, structural, mechanical, plumbing, electrical and technology engineering, as well as full-service, integrated design/build services for America's fastest growing business segments. That expertise could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 was caused by DEW. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

39.    Defendant Underwriters Laboratories, Inc. Underwriters Laboratories Inc. (UL) is an independent, not-for-profit product safety certification organization that has been testing products and writing Standards for Safety for over a century. UL evaluates more than 19,000 types of products, components, materials and systems annually with 21 billion UL Marks appearing on 71,000 manufacturers' products each year. UL's worldwide family of companies and network of service providers includes 66 laboratories, testing and certification facilities serving customers in 104 countries. Its corporate headquarters is located at 33 Pfingsten Road, Northbrook, IL 60062-2096. That expertise could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 was caused by DEW. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly. Said defendant not only knew that the quality of steel used in the construction of WTC1,2 should not have been significantly harmed or weakened by the stated combined effects of crash damage, fire and/or gravity, it overtly suppressed such information by terminating the services of one of its employees, Kevin Ryan, who called attention to that incongruity of causal explanation. Nonetheless, defendant then proceeded to engage in further fraud and deception by intentionally ignoring and/or manipulation information that knew, or should have, that WTC1,2 were destroyed by means other than those stated in NCSTAR 1.

40.    Defendant Wiss, Janney, Elstner Assoicates, Inc.(WJE) has its principal place of business at 330 Pfingsten Road, Northbrook, Illinois 60062 and is engaged in a wide range of structural and materials testing services. That expertise could have been, but was

not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 was caused by DEW. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly. This defendant also analyzed steel remnants, including some showing obvious indicators of a degree of deformation, of destruction, of ablation and/or of molecular dissociation that could not have resulted from fire, gravity or crash damage, singularly, or in the aggregate. Yet, said defendant continued to commit and/or to allow fraud to occur, by allowing the assertion that steel could be destroyed in the manner they saw, observed, catalogued and otherwise documented by brief, uncontrolled exposure to kerosene-based fire. Kerosene, a middle distillate, combustible fuel, upon information and belief, physically cannot attain even a high fraction of the temperature needed to deform steel in the manner WJE knew to have existed. Thus, WJE committed fraud.

41.     Defendant American Airlines is a division, subsidiary and/or brand name of AMR Corp., with a headquarters or principal office located at 4333 Amon Carter Boulevard, Fort Worth, TX 76155. American Airlines had one or more aircraft that were said to have been involved in the events of 9/11/01 and American Airlines then consulted with NIST in the preparation of NCSTAR 1. That expertise could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 was caused by DEW. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

42.    Defendant Silverstein Properties has an office or place of business at 250 Greenwich Street, 38th Floor New York City, NY 10007 and holds a leasehold interest in and to the site where WTC1,2 stood.  As such, this defendant had a clear conflict of interest in steering the investigation away from any hint, suggestion, much less conclusion that DEW were a causal factor in the destruction of WTC1,2 and the rest of the World Trade Center complex.  Indeed, one anomaly that should be a hint that something is amiss is that all buildings having an address prefix of "World Trade Center," namely buildings 1 through and including 7, were all completely and utterly destroyed on 9/11/01.  Yet, for as horrific as that destruction was, virtually all other buildings in the area, some having a spatial relationship that was as close or nearly so as the WTC buildings were, one to the other, were not damaged very much at all, relatively speaking.  Upon information and belief, Silverstein Properties benefited from an insurance claim relating to the events of 9/11/01.  Upon information and belief, at least two of the insurers found to have been liable under their policies of insurance or of reinsurance with respect to this defendant, have, nonetheless, questioned the validity of the claim, based, in part, on the admission made by Larry Silverstein that WTC 7 was intentionally demolished, or words to that effect; and, further based on the as yet inadequate explanation of what did, in fact, cause the destruction of the World Trade Center complex,.  Upon information and belief, yet another presently pending action calls attention to the fact that a principal of this defendant, Larry Silverstein, has publicly admitted that WTC was intentionally demolished by using phrases that are to that effect.  In that and in other ways,  defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting

23

payment improperly. Most assuredly, this defendant has a clear, palpable conflict of interest that would motivate it to manipulate and avoid any consideration that DEW might have been a causal factor in the destruction of WTC1,2.

43.    Defendant United Air Lines, whose parent corporation is UAL Corporation, has its headquarters at 2 N. LaSalle Street, Chicago, IL 60602, with a mailing address of P.O. Box 66100, Chicago, IL 60666. United Airlines had one or more aircraft that were said to have been involved in the events of 9/11/01 and United Airlines then consulted with NIST in the preparation of NCSTAR 1. That expertise could have been, but was not, used for purposes of calling attention to the fact that the effects seen and left by the pattern of destruction of WTC1,2 was caused by DEW. Instead, defendant chose to use its expertise to commit fraud based on either withholding information or manipulating information and by then accepting payment improperly.

44.    Attached as Exhibit E and incorporated herein by reference, is a chart listing all parties who either contracted with or consulted with NIST in ways that are at issue in this action, hereinafter the "NIST participants."

## V. THE FALSE CLAIMS ACT

45.    The False Claims Act (FCA) provides, in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made

or used, a false record or statement to get a false or

fraudulent claim paid or approved by the Government; (3)

conspires to defraud the Government by getting a false or

fraudulent claim paid or approved by the Government; . . .

or (7) knowingly makes, uses, or causes to be made or used,

a false record or statement to conceal, avoid, or decrease an

obligation to pay or transmit money or property to the

Government,

* * * is liable to the United States

Government for a civil penalty of not less than $5,000 and not more than

$10,000, plus 3 times the amount of damages which the Government

sustains because of the act of that person . . . .

(b) For purposes of this section, the terms "knowing"

and "knowingly" mean that a person, with respect to

information (1) has actual knowledge of the

information; (2) acts in deliberate ignorance of the truth

or falsity of the information; or (3) acts in reckless

disregard of the truth or falsity of the information, and

no proof of specific intent to defraud is required. See 31

U.S.C. § 3729(a) and (b).

## VI. THE NIST WTC INVESTIGATION

46.    In 2002, Congress enacted the National Construction Safety Team Act, 15 USC @ 7301, et seq.

47.    During the time period relevant to this complaint, NIST paid for consulting services on the basis of certain contracts and solicitation and on the basis of requisitions for the NIST participants' reported costs.

48.    Commerce Department is responsible for the administration and supervision of NIST.  NIST, an agency of Commerce Department, is directly responsible for the WTC investigation program.

49.    During the course of the ongoing WTC investigation, including especially the time period of 2002 up to and including September of 2005, the NIST participants have submitted claims for payment to NIST arising under their various contracts and solicitations for services and/or reimbursement of expenses.   The NIST participants received and are receiving payments on said claims.

50.    Cost reports are thought to exist that contain specific financial data relating to the payments made by NIST to the NIST participants.

51.    All defendants are and were familiar with the law and regulations governing the WTC Investigation, including requirements relating to the submission of cost reports, accurate data, from either fraud or conflicts of interest and without violating the False Claims Act.

## VII. THE DEFENDANTS' SCHEME

52.    The destruction of the WTC on September 11, 2001, was caused, in whole or in part, by the use of Directed Energy Weapons, consisting in High Energy Lasers and or

other operational, but largely secret weapons that are, nonetheless, known to exist and known to have been deployed and/or deployable in the year 2001, before and after. It is also clear and apparent on its face that NIST's explanation of the destruction of WTC1,2, issued in or about the month of September, 2005, is blatantly false, incomplete, misleading and fraudulent. As earlier stated, NIST first described its mandate, in words and substance, as that of determining what caused the destruction of WTC1,2. Then by intentional and admitted modification and narrowing of the scope of that stated objective and mandate, NIST openly declined to carry it out. That modification was at the behest and with the urging, backing and/or combined manipulative power of the defendants, acting singularly, collectively, overtly, covertly and otherwise.

53.    Several of the defendants with whom NIST contracted for services in the preparation of NCSTAR 1 are, themselves, primarily engaged as defense contractors in a variety of disciplines, including, without limitation, very specific involvement in the use, development, manufacture, testing and or assessment of usability of directed energy weapons. In other words, NIST contracted with those who have the greatest familiarity with directed energy weapons in order to produce a report that sought to go to any length necessary to avoid, disguise, omit and otherwise divert attention away from the actual, real and intended destruction of the WTC complex by use of one device, namely directed energy weaponry, while pretending that the cause was the result of conditions that would be impossible based on the extent to which the NIST report, NCSTAR 1 violated both the laws of physics and common sense. By way of one example, NIST's NCSTAR 1 report found no piece of steel that had been subjected to a temperature higher than 600 degrees C, and most had not encountered a temperature of higher than 250 degrees C; yet, NIST

offered no explanation whatever for the visual confirmation that most of the steel of the WTC complex was turned to dust and otherwise visibly subjected to a destructive process that could not conceivably have been caused by the effects, combined or otherwise, of jet fuel, gravity and/or damage from jetliner impacts.

54.    In point of fact, NIST, despite surrounding itself with contractors who are at the epicenter of that part of the military industrial complex that specializes in the production of directed energy weapons, in the dissemination of false news, so called psychological operations (psy ops) and who also specialize in public perception management programs, among other disciplines and areas of expertise that enabled, contributed to and/or facilitated the fraudulent scheme herein described and which has succeeded, thus far, in fraudulently presenting a false and misleading, fraudulent and illegal report on what caused the destruction on 9/11/01 of the WTC complex, and the receipt of improper payment in furtherance thereof.

55.    However, on March 16, 2007, relator, Dr. Judy Wood, caused to be submitted a Request for Correction (RFC) that plainly stated that the WTC complex was destroyed by use of directed energy weapons. Plaintiff, relator, Dr. Judy Wood, in so doing, placed NIST on notice that false claims had been submitted to the government. Relator is, then, the original source of that claim and hereby reiterates that the WTC complex was destroyed on the basis of the use of directed energy weapons and all defendants knew or should have known this. Many of said defendants are involved in the manufacture of directed energy weapons as and for their primary business function.

## VIII. FALSE CLAIMS AND FALSE STATEMENTS TO NIST

56.    The various cost reports, requisitions, billing statements and/or requests for reimbursement submitted by the defendant NIST participants from and after 2002, through, at least, September, 2005, and, in many instances, continuing to the present, all contained false claims for reimbursement and made false statements to NIST concerning work performed by them and/or consulting services rendered to NIST because the true nature and intent was to mislead NIST and to cause a false causal statement concerning what caused the destruction of the WTC complex to occur.

57.    Exhibit A contains the following information regarding the nature of the destruction of the WTC complex and the evidence in support thereof:

a)    The near free-fall timeframe of destruction.

b)    The failure properly to assess the dynamic of "tipping" of WTC 2 during its destruction.

c)    The lack of debris, consistent with unusual energy effects.

d)    The "holes" that are only adequately explained based on unusual energy effects, consistent with the use of DEW.

e)    Vehicles that are inexplicably burned as if toasted and found in unexplained places and at varying distances from Ground Zero; simultaneous lack of burning of paper.  Each of these widespread effects are unusual energy effects, consistent with DEW.

f)    Steel turned to dust as literally as the buildings are being destroyed before our very eyes.  These effects defy explanation other than that of DEW.

29

g)    The existence of DEW is confirmed by information in the public domain.

58.    Thus, in that manner, it is clear and apparent that NCSTAR 1 is false and

misleading, on its face and as a result of the particular information set forth above and in

Exhibit A.

59.    All NIST participants, defendants, knowingly filed or caused the filing of those

false or fraudulent cost reports to get claims paid that should not have been paid,

precisely because doing so resulted in the facilitation of the publication by NIST of a

false, fraudulent and misleading causal report; namely NCSTAR 1, occurring in or about

the month of October, 2005.

60.    All such submitted costs reports, invoices, reimbursement claims and the like

constitute false claims under the False Claims Act because the defendants knew they

included costs that the actual cause of the destruction of the WTC complex was the result

of the use of directed energy weapons.

### IX. DAMAGES

61.    The United States was damaged because of the acts of defendants in submitting

or causing to be submitted of false claims, statements and records in that it was forced to

pay the NIST participants for services rendered and related items and services that were

all a part of a scheme to submit false and fraudulent information to NIST, resulting in the

publication of a misleading, false and fraudulent report; namely, NCSTAR 1.

## FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))
(All Defendants)

62.     Plaintiff repeats and realleges each allegation in ¶¶ 1 through 60, as if fully set

forth herein.

63.     The defendants knowingly presented or caused to be presented false or fraudulent

claims for payment or approval to the United States.

64.     By virtue of the false or fraudulent claims made by the defendants, the United

States suffered damages and therefore is entitled to treble damages under the False

Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each

false claim.

## SECOND CAUSE OF ACTION

(False Claims Act: Making or Using False Record or Statement)
(31 U.S.C. § 3729 (a)(2))
(All Defendants)

65.     Plaintiff repeats and realleges each allegation in ¶¶ 1 through 60, as if fully set

forth herein.

66.     The defendants, and each of them, knowingly made, used, or caused to be made

or used, false records or statements to get false or fraudulent claims paid or approved by

the United States.

67.     By virtue of the false records or statements made by the defendants, the United

States suffered damages and therefore is entitled to treble damages under the False

Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each

false claim.

31

### THIRD CAUSE OF ACTION

(False Claims Act: Reverse False Claims) (31 U.S.C. § 3729(a)(7))
(All Defendants)

68.     Plaintiff repeats and realleges each allegation in ¶¶ 1 through 60, as if fully set forth herein.

69.     The defendants knowingly made, used or caused to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States.

70.     By virtue of the false records or statements made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each false claim.

### FOURTH CAUSE OF ACTION

(Unjust Enrichment)
(All Defendants)

71.     Plaintiff repeats and realleges each allegation in ¶¶ 1 through 60, as if fully set forth herein.

72.     This is a claim for recovery of monies by which the defendants have been unjustly enriched.

73.     By directly or indirectly obtaining government funds to which they were not entitled, the defendants were unjustly enriched, and are liable to account and pay such amounts, or the proceeds or profits there from, which are to be determined at trial, to the United States.

## FIFTH CAUSE OF ACTION

(Payment by Mistake)
(All Defendants)

74.     Plaintiff repeats and realleges each allegation in ¶¶ 1 through 60, as if fully set

forth herein.

75.     This a claim for the recovery of monies paid by the Untied States to the

defendants by mistake.

76.     The United States, acting in reasonable reliance on the accuracy and truthfulness

of the information contained in the cost reports submitted by defendants, paid the NIST

participant defendants certain sums of money to which they were not entitled, and

defendants are thus liable to account and pay such amounts, which are to be determined

at trial, to the United States.

## SIXTH CAUSE OF ACTION

(Recoupment of Overpayments)
(All Defendants)

77.     Plaintiff United States repeats and realleges each allegation in ¶¶ 1 through 60, as

if fully set forth herein.

78.     This is a claim for common law recoupment, for the recovery of monies

unlawfully paid by the United States to the NIST participants defendants contrary to

statute or regulation.

79.     The United States paid the NIST participants defendants certain sums of money to

which they were not entitled.  Defendants are thus liable under the common law of

recoupment to account and return such amounts, which are to be determined at trial, to

the United States.

33

## SEVENTH CAUSE OF ACTION

(Common Law Fraud)
(All Defendants)

80.     Plaintiff repeats and realleges each allegation in ¶¶ 1 through 60, as if fully set forth herein.

81.     All NIST participants defendants made material and false representations in the cost reports they submitted to NIST for payment and/or for reimbursement with knowledge of their falsity or reckless disregard for their truth, with the intention that the government act upon the misrepresentations to its detriment. The government acted in justifiable reliance upon defendants' misrepresentations by not only paying for the claimed services and the claimed entitlements to reimbursement, but also by incorporating the false, misleading and fraudulent data and conclusions into NCSTAR 1, as intended by the NIST participants defendants.

82.     Had the true facts been known to plaintiff, all defendants would not have received payment of any sum whatsoever, based on the nature and the extent of fraud committed by the NIST participants defendants.

83.     By reason of having made such payments, plaintiff has been damaged in an as yet undetermined amount.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of it as follows:

1.    On the First, Second, and Third, Causes of Action under the False Claims Act, against all defendants, for the amount of the United States' damages, multiplied as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.    On the Fourth, Fifth and Sixth Causes of Action, for unjust enrichment, payment by mistake, and common law recoupment against all defendants, for the damages sustained and/or amounts by which defendants were unjustly enriched or by which defendants retained illegally obtained monies, plus interest, costs, and expenses, for an accounting of such monies and such further relief as may be just and proper.

3.    On the Seventh Cause of Action, for common law fraud against all defendants, for compensatory and punitive damages, together with costs and interest, and for such further relief as may be just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demands a trial by jury on all the issues.

THE PLAINTIFF

By_____

Jerry V. Leaphart #JL4468
Jerry V. Leaphart & Assoc., P.C.
8 West Street, Suite 203
Danbury, CT 06810
(203) 825-6265 – phone
(203) 825-6256 – fax
jsleaphart@cs.com

Dated: April 25, 2007
    Danbury, CT