Jerry V. Leaphart #jl4468
Jerry V. Leaphart & Assoc., P.C.
8 West Street, Suite 203
Danbury, CT 06810
(203) 825-6265 – phone
(203) 825-6256 – fax
jsleaphart@cs.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DR. MORGAN REYNOLDS, on behalf of   :
The United States of America        :
                                    :
            Plaintiff,              :        <u>ECF CASE</u>
vs.                                 :
                                    :        January 28, 2008
SCIENCE APPLICATIONS                :
INTERNATIONAL CORP., et al          :        07 CIV 4612 (GBD)
                                    :
            Defendants.             :

## <u>AFFIRMATION OF ATTORNEY – JERRY V. LEAPHART</u>

1.      I, Jerry V. Leaphart, am an attorney at law, duly licensed to practice before this and other

courts, am attorney of record and Lead Counsel for the plaintiff, Dr. Morgan O. Reynolds

(plaintiff) in the above-captioned matter.  This affirmation is in support of plaintiff's opposition

to the motions to dismiss submitted by some defendants.

2.      It is respectfully submitted that the narrowly tailored review that can occur at this

preliminary stage of this case, prior to any discovery at all, cannot properly result in its dismissal.

Plaintiff has demonstrated full compliance with the requirements for being an "original source"

under and pursuant to the qui tam relator provisions of the False Claims Act, all as more

thoroughly elaborated in the Memorandum of Law submitted simultaneously herewith.  In his

RFCs dated March 8 and May 1, 2007, respectively (Exhibits A and B of plaintiff's affidavit), plaintiff alleged the defendants herein committed fraud.  In its response to plaintiff dated September 28, 2007, (Exhibit D of plaintiff's affidavit),  NIST <u>did not</u> even deny plaintiff's allegations of fraud.  At most, all NIST did was to provide a partial explanation for why SAIC, the first named defendant herein, but one who has not filed a motion to dismiss might not be liable.  I am not making this up.  Here is the relevant excerpt from the NIST response:



Excerpt from NIST Response 9/28/07

The salient portion from the above excerpt states:

> "You further request that NIST correct NCSTAR1 to disclose the extent to which SAIC is involved with defense contracts, intelligence contracts, directed energy weapons, payment of  court ordered fines and psychological operations, as well as acknowledge that undue influence may have beeen a factor leading to the false, misleading, deceptive and fraudulent conclusions that you assert were reached and published in NCSTAR 1."

The above, then, not only confirms that plaintiff herein is the original source of the assertions of fraud, it also confirms that NIST responded to his assertion by FAILING TO DENY THEM.

This is or should be outcome determining for purposes of the courts limited jurisdictional inquiry.

3.      What remains to be addressed is the apparent certainty that informs the various submittals of the defendants herein who have appeared thus far.  Two of them, UL and ARA, have filed motions under F.R.Civ.P. Rule 11 and others of them express their legal argumentation as though their position on the matter is divinely inspired, written in Holy Script and otherwise infallible. They also seek attorneys' fees.  However, some defendants, notably the first named one:  Science Applications International Corp. (SAIC) may currently be in default, as nothing other than an appearance by counsel has been entered for SAIC.

4.      Argumentation of the type defendants are engaging is unusual, in my experience.  I assert I am familiar with F.R.Civ.P Rule 11, have been practicing before this court for a goodly number of years, have never before been found liable for Rule 11 sanctions and do not believe that Rule contains a provision involving limitations on actions that some consider to be unpatriotic because the implications of the case may suggest criminal wrong-doing by governmental actors.  There exists significant anecdotal data indicating that many persons who are in some way connected with governmental authority and/or governmental funding, directly or indirectly, are commonly and typically subjected to pressures and improper duress if and when they make assertions that challenge, in one way or another, the official version of the events of 9/11.  Perhaps that is why others have not come forward with what they know.   The defendants, then, may be engaging in improprieties by raising Rule 11 issues.  I do not rule out using Rule 11 against them.

5.      The evidence in support of questioning the events of 9/11 is clear and palpable and is in need of legally permitted review in accordance with applicable statutory and procedural norms, like false claims, that are available, under law, in a free and reason-based society.

6.      As anecdotal confirmation of the unwarranted pressures placed upon those who question 9/11, we have but to consider the letter submitted by counsel in this case just prior to the

preparation of this Affirmation, a letter dated January 23, 2008, annexed as Exhibit 1.  That letter concludes with a declaration that due process, in the form of oral argumentation, is not necessary and it implies that the outcome of the case is a foregone conclusion.

7.      Is that so?  As an anecdote of undue arrogance and of duress, annexed hereto as Exhibit 2 is an article indicating that a career military non-commissioned officer who had earned a Purple Heart citation in Iraq, was demoted for questioning 9/11.  Even conceding, arguendo, that military personnel cannot question their superiors to the same degree other citizens can, what happened to that officer certainly has a "chilling effect" upon those who seek to keep governmental authority in balance.  Defendants herein have offered no proof at all that they are immune from FCA claims.  Plaintiff herein certainly engaged in a known, demonstrated approach to staking out his claim as an "original source;" and his information is substantiated by evidence and by common sense.

8.      On the issue of sanctions, defendant, ARA, in communicating their desire to seek them, actually committed to writing a "judicial admission" of wrongdoing, based on the literal content of Exhibit 3, annexed hereto.  At this early stage in the proceedings, Exhibit 3 must be accepted as it is literally written.  It is, indeed, ironic that a claim for entitlement to Rule 11 sanctions should be put forward in a communication containing a written admission of wrongdoing.  The relevant quote is:

> "To make a long story short ARA is not involved in those things you allege and even if something was done that was wrong, ARA was a part of it."  See Exhibit 3

This court must consider the above quoted admission as just that, without exception, at this stage in the proceedings.  It cannot be claimed to be error of some sort.  It could just as easily be a Freudian slip, as that term is commonly understood.  ARA, like all defendants herein, may

4

harbor would be whistleblowers who, until now, have been too intimidated to speak out. That could very well be the reason behind ARA's admission.

9.      The "long and the short" of the "ARA story" will, no doubt, be revealed during discovery, now that it has been put at issue in the way of an overt and specific admission. The above quote is an evidentiary admission if ever there was one. There is no other way to characterize the quoted admission other than as such. It may be sufficient, standing alone, to preclude the granting of a motion to dismiss as to ARA and to all defendants who joined with it. That, at least, is a reasonable inference to be drawn from that admission.

10.     The plaintiff herein stakes his status as an "original source" of information of fraud upon documents that he prepared and filed with NIST and that NIST publicly disclosed. It is already noted that one defendant, ARA, has admitted (as in a judicial admission) that the filing of RFCs is a public disclosure satisfying the requirements for an original source. This point is elaborated in detail in the annexed Memorandum of Law. Similarly, there are an abundance of "particulars" confirming the claim of fraud; and, in any event, a complaint is still a form of "notice pleading" even under Rule 9(b). The defendants herein know what they are being called upon to defend. Let them do it. The allegations of fraud in this case are clearly distinguishable from those in Wood v ARA 07cv3314 (GBD); and, in any event, that case has not yet been vetted or considered for consolidation with this one. The 'first-to-file' bar is clearly inapplicable at this early stage.

11.     The defendants express a desire for "particulars" as to the fraud they have committed. Annexed as Exhibit 4 is a fulsome compilation of the contracts that the named defendants, and others, entered into, the full and exact content of which, is not yet available. However, it is well-

nigh certain that the contracts will detail an obligation to engage in "good faith" work, free of fraud, expressed in one way or another. This is a matter for discovery. Defendants cannot have entered into contracts shielding them from fraud if they committed it.

12.     Even though the exact content of the contracts is not known as yet, the annexed compilation, Exhibit 4, summarizes, by inference, the areas of willful blindness that defendants committed whilst compiling and researching the NCSTAR series of reports, published in 2005.

13.     The contracts listed in Exhibit 4 outline the work which was to have been carried out for NIST. These listings came from http://wtc.nist.gov/solicitations/ and from http://wtc.nist.gov/solicitations/solicitation_selection_process.htm. The work they were called upon to do was of the precise nature that could have and should have resulted in the discovery that no jetliners hit the WTC on 9/11.

14.     Once the events of 9/11 are revisited and closely re-examined, sticking firmly to known physical laws, properties of materials and actual witness accounts, most aspects of the generally assumed causes of the events do not stand up to scrutiny and are revealed to be false. Those persons and entities, like defendants herein, who had an obligation to examine the events rationally and professionally, and get paid to do so, had an obligation not to be blindly indifferent to reason-based information, much less help further the fraud. Yet, that is what the defendants, in fact, did and plaintiff has made that claim.

15.     The basic facts, which are not open to debate, include the fact that jetliners are hollow tubes, made of light materials, even when traveling at the stated speed of around 540 mph, cannot cause the damage observed at the WTC. This is true even when an infinite number of computer models or simulations, with an infinite number of initial parameters, have been run to suggest, deceptively and fraudulently, that it might be possible.

6

16.    For purposes of subsequent discovery, it is to be noted that the defendants have a wide range of technical expertise that should easily have led some among them to recognize the comparative robustness of steel versus aluminum would serve to preclude the standard explanation of events.  Here is how this point might be illustrated:

Steel (A 36 Structural from construction of WTC towers):



Aluminum:



17.    It is therefore unreasonable to claim, without examination, that a jetliner made of light materials (for actual/efficient flight) caused this damage to a structure of concrete and steel, without causing any debris at all – in that the evidence to be adduced in this case will confirm that steel beams cannot be severed by thin wings; and, instead, aluminum tubes can be severed and destroyed by even small amounts of steel, let alone load-bearing (for the tallest buildings in the world, when built).  What is seen below is, then, the opposite of reality:



Here is another image of the supposed hole made by a supposed jetliner in the WTC North Tower:



That image recalls the Roadrunner cartoon series and might just as well have looked like this:



18.     Not only that.  The process of getting the supposed jetliners to the WTC, by individuals having next to no training as pilots and no training at all claimed to have been derived from commercial jetliner flight experience could not have gotten the jetliners to do what visual images suggest they did.  See affidavit of John Lear.

19.     In the above photo illustration note, too, that the cuts are not even consistent with entire wings entering into the building; yet, we have information, from the Fire Chief, Chief Cassano, who was among the first to report to the scene that "there was no debris" on the ground.  He did not have any reason-based information that would lead to the conclusion that a plane of any sort, let alone a wide-body, 767 jetliner, had crashed into the WTC.  Chief Cassano stated:

**"No, there was no debris on the street at all from the first plane."[1]**

20.    Early on, a few observers recognized the incongruities of the 9/11 myth.  Annexed hereto as Exhibit 5 is an article entitled "Muslims Suspend Laws of Physics."  That article is not correct in detail and, of course, forms no part of the actual information that this case is based on.  It does, however, indicate that something was known to be amiss with the 9/11 story early on.  In fact, the earliest questioning of the official myth that I could locate is dated 9/14/01.  Questioning is not the same as putting forth a qui tam challenge.  That process, a process in which plaintiff herein and one other have engaged in is far more rigorous than merely asking questions.  Plaintiff satisfies those rigors.

21.    Law, in its litigation aspect, depends upon admissible evidence, including what witnesses have had to say and business records.  Photographs are admissible when certain known conditions are met.  This affirmation is presented at the very preliminary, motion to dismiss stage of this case.  All information set forth herein is either admissible evidence; or, at a minimum, can be used during the discovery process to help secure or locate admissible evidence.  Further in this respect, annexed hereto as Exhibit 6 is a remarkable compilation of actual witness statements compiled from the so-called 9/11 Task Force that contains the business record witness accounts of more than 500 so-called "first-responders" to the events of 9/11 in NYC.  I suggested the project in my capacity as plaintiff's counsel, leading to the preparation of the said compilation in order to re-confirm plaintiff's "no jetliner" assertion.  Contrary to popular belief, there are surprisingly few people who actually say they saw and heard a plane, let alone a jetliner from among the population of people who were both cogent and verifiably present.  I think this satisfies Rule 11.  These accounts are from police officers, firefighters and emergency medical

---

[1] See: http://graphics8.nytimes.com/packages/pdf/nyregion/20050812_WTC_GRAPHIC/9110011.PDF  at pg  15 of 19

technicians, for the most part.  As a condition for qualifying for the work they do, these are all

people with good faculties of observation and of reason, together with an inherent duty to be

observant of the surrounding environs, all of which are conditions for their continued ability to

have the jobs they have.

22.    Looked at from a legal perspective, it can be stated, with the same kind of certainty, and,

perhaps, more so, as that expressed by some counsel for defendants herein, that the actual and

the admissible evidence from the real witnesses casts so much doubt on the claim that two wide-

body jetliners hit the WTC on 9/11 as to be outcome determining of this case at this early stage;

namely:  Motions to dismiss, denied.

23.    I am not making claims of victory, as my adversaries appear to want to do, but I do here

proclaim that the admissible evidence overwhelmingly confirms that no jetliners hit the WTC on

9/11.  See Exhibit 6.

24.    Witness statements almost always conflict, one with another.  At this stage in the

proceedings which do not even involve the "summary judgment" standard of review, the

conflicts among witness statements serve solely to create the existence of a dispute as to a

material fact.  The art of fact-finding is that of resolving discrepancies (disputes as to material

facts) among witnesses.  This is a matter of reason.  Exhibit 6 demonstrates not just a stunning

lack of confirmation of the jetliner claim, in so doing, it actually refutes it.  This is obvious:  Had

two actual Boeing 767 jetliners hit the WTC on 9/11 while traveling at speeds they can only

legally use at high altitude (because of noise level limitations), people within the vicinity would

have unmistakably seen and heard such events.  There are next to no verifiable witnesses who

say any such thing.  None.  True, there are witnesses who say they saw and heard a plane hit

WTC Tower 1.  That is, there is one (1) such person.  One.  Consider the event, though.  A

supposed wide-body 767 jetliner, 1000ft. above ground over Manhattan, traveling at over

400mph and one (1) person[2] from amongst a population of over 500 people known to be nearby

and who then reported directly to the scene shortly afterwards.  If nothing else, that is the

substance of fact-finding.  That is the information that informs Dr. Reynolds' case.  That specific

fact casts significant doubt on what actually happened and it is not an isolated factual statement.

Courts of law are for finding facts.  The incongruities here demonstrated are worthy of finding

out why, amongst the defendants, did they not realize there were virtually no witnesses to an

event that should have resulted in imagery and auditory impacts that were overwhelming,

unmistakable and that resulted in descriptions of phenomena consistent with the claimed event,

rather than consistent with there having been no jetliner crashes, as plaintiff herein demonstrates.

25.    Here is an example of the incongruities associated with even those witnesses who say

they saw and heard a plane.  The following excerpt is, by the way, among the strongest witness

accounts from among those few persons who, by virtue of his actual known location, supposedly

saw and heard both planes.  Yet, even this witness, Murray Murad, expresses *undeniable doubt*:

> "Plane 1: It was about 8:41 that we heard a plane hovering over the fire house. It sounded
>
> like the plane was right on top of us. At that time the captain was upstairs. He was taking
>
> a shower in the office and I was conducting the work with the fire fighter. The captain
>
> came out and said: "What's going on? This is a no-fly zone. There should be no planes
>
> over here unless this is a military plane, a plane in trouble." Other than that, there was
>
> really no clue. .... Maybe about 10 to 12-minutes after that first plane, I heard another
>
> plane. Then I said to myself, we're being attacked. I ran downstairs. No sooner did I run
>
> downstairs and look up, that I saw the second plane strike the south tower. It was such a

---

[2] See Exhibit 5, witness Thomas Spinard

vicious hit and such a precision hit, it was unbelievable.

Q. Did you see or hear the second plane before it hit the World Trade Center?

A. I never actually saw the plane, but l heard it. You could hear it coming in and then we heard the explosion and you could hear the roar of the plane coming in. At first I didn't realize it was a plane. I thought it was like the roar of fire, like something had just incinerated, like a gas tank or an oil tank.

It sounded like a tremendous roar and then you heard boom and then there was a big fire, a lot of fire, a big fireball. I never actually saw a plane hit the building. I never saw that. I saw it on television, but I never saw it while I was standing there.

The building material was sort of gray and you could see it, you know, how it differed from the plane. I was listening to the tape this morning of the people calling up and they were describing the plane that hit the building. Actually, so many people saw it. They actually described the plane as it came in. They said it was a military-type plane and it was green and it was this. I mean, I never saw the color of the plane.

Q. Where were you when the second plane hit?

A. We were down at the command post between Liberty and Albany on the west side of West Street. "[3]

26.     Note what the witness, Murray Murad, actually says:

**"Plane 1: It was about 8:41 that we heard a plane hovering over the fire house. It sounded like the plane was right on top of us."**

---

[3] Exhibit 6, pg. 37, segment 6.1.2

That description "hovering" is utterly inconsistent with a jetliner flying overhead at over 400mph and there is no description of what should have been an overwhelming 'crash' sound as well as jet blast effects. I am not making this up. We are here quoting a witness. Murad also says:

> "At first I didn't realize it was a plane. I thought it was like the roar of fire, like something had just incinerated, like a gas tank or an oil tank."
>
> **"I never actually saw a plane hit the building. I never saw that. I saw it on television, but I never saw it while I was standing there."**

There is nothing ambiguous about the above quote. He did not see a plane and did not realize there was one. His words, a fair paraphrase of which is that there was no jetliner there.

27.    Witness Murad also confirms where he was: "We were down at the command post between Liberty and Albany on the west side of West Street." Let us consider the relationship of that location to the south tower, WTC 2, about which Murad testified:



28.    It is easy to ascertain that West Street, between Liberty and Albany puts him in a position where WTC Tower 2 would literally have loomed right over his head, placing him virtually right next to WTC 2 where he had an excellent vantage point for being both an actual eye and ear witness based on that location and for being able to ascertain if a jetliner crashed into WTC2. But, in his own words he stated:

**"I never actually saw the plane…"**

He also states:

**"At first I didn't realize it was a plane. I thought it was like the roar of fire…"**

Two separate sense observations are there to be found.  He neither saw nor heard a jetliner. Considering his location and his testimony, it is reasonable to assert that someone standing that close should not have had difficulty being clear and direct in describing, correctly, the audio and visual effects had there actually been a wide-body 767 jetliner, a mere 800ft above ground traversing at 540mph.  Clearly, the eyewitness testimony here presented flatly, plainly and irrefutably contradicts any such claim and precludes granting a motion to dismiss.  If time is taken with Exhibit 6, it will become far more apparent that witness Murad is but one example of that norm; namely, that the actual eye and ear witnesses do not confirm the crashes of any wide-body jetliners into the WTC.  There is next to no confirmation of any plane hitting the WTC from amongst those who were there, let alone wide-body jets travelling at their top speed that would have created sound pressure and jet blast that would have had devastating effects on people and buildings, including producing significant ear damage, to mention but one effect that simply has not been shown to have occurred.  Instead, there is nothing but doubt and actual testimony confirming that an explosion occurred; that and nothing more.

29.     Fraud is fraud and plaintiff herein has exposed it.  Speaking for me, it is absurd, under the circumstances, to put Rule 11 at issue, based on the facts of the matter.  What remains is simply whether Rule 11 prohibits lawyers from questioning authority in the same way that military officers are not permitted, apparently, to question authority.

30.     Legally, the information that is merely exemplified here and, by no means set forth in all of its detail, confirms it is premature to dismiss this case.  We are here illustrating precisely what distinguishes plaintiff herein from a mere interested party.  I am reasonably certain that more information confirming that no jetliner hit the WTC has been brought forward in this preliminary and only partial, tip of the iceberg, submittal, than any of those who filed Rule 11 motions deemed remotely possible.  Certainly, none of their expressions of righteous indignation demonstrated any awareness whatsoever of the fact that there are witnesses who say they neither saw nor heard jetliners despite being in a position to do so, had there been any such things present.

31.     There are virtually no reliable eye and ear witnesses who report information consistent with the presence of wide-body, 767 jetliners, *except* those whose impressions were formed by what they saw on teevee, as in Orson Wells' analogy of "The War of the Worlds".   Witness Murad further acknowledges in what I think is an outcome determining declaration, as follows:

### "I saw it on television, but I never saw it while I was standing there."

In terms of evidence, I do not think I have ever had admissible evidence that is any better than that in any case I have ever brought before this tribunal.  I am here relying upon those who were present and who were properly positioned to be witnesses.  The witness quoted above actually reports information inconsistent with a wide-body 767 jetliner, less than 1000ft above ground,

travelling at 540mph, even while seemingly supporting the common myth. The sound of a jetliner is a common experience and it does not sound like the roar of fire, like something had just incinerated.

32.     As an attorney, it behoves me to seek out independent means of confirming, verifying and/or refuting a particular point, issue or claim. Most people are strongly offended by the claim that "no wide-body 767 jetliner(s) hit the WTC on 9/11." I know that. Yet, the witnesses confirm that statement and so do, among other means of ascertaining the truth of what happened, the visual records of the event. This photograph, taken from a teevee report of the event that only ran one time and was then discarded from the Fox Network's archives looks like planted or inserted image that is faked:



33.    In my experience in familiarizing myself with my client's claim, I can say that all known video and photographic images of the jetliners involved at the WTC on 9/11 look faked or suspect for one reason or another, just like the one posted in paragraph 32 above does.

34.    It has already been mentioned that the Fire Chief who was among the first on the scene, Chief Cassano, stated "no plane debris was there" or words to that effect.  His information is consistent with the negligible plane debris that was said to have been recovered at the WTC, that can be traced through information sources available to me, thus far.  Literally, one can count on less than two hands, so to speak, the number of plane wreckage parts from the scene of two supposed wide-body 767 jetliners.  Here is one of them:



35.    What is the part seen above and is it consistent with a 767 jetliner?  Information available thus far is highly inconclusive and controversial on that subject.  Moreover, there is some evidence the part was planted at the intersection of Church and Murray streets.

36.    The trajectory that the piece would have had to travel to get to Church and Murray is improbable:



37.    On a superficial level, the following photograph is sometimes said to confirm the

trajectory of the engine part:

38.     However, to get to Church and Murray, the part would first have had to clear twenty story buildings that are mathematically impossible to have actually occurred, given the parabolic formulae that apply:





39.     The photographic evidence also shows opportunity for planting in that an unusual number of vehicles of personnel and other apparatus is known to have taken place at Church and Murray:





If one looks closely, a chair can be seen next to the fire truck. Was that for sentry duty while the part was being planted?



Why are so many people being called to Church and Murray?

40.    Another anomaly associated with debris is that we know there was no visible debris on the south side of WTC 2, at least as seen in the videos. And, we also know, from NCSTAR 1, that there were no obvious exit points on the north face of WTC 2 from which debris could have been emitted:



Figure 6–30.  East side of north face, WTC 2, at 9:58 a.m., just before collapse.

41.    The defendants herein worked on preparing simulations like the one depicted below.

Such simulations serve only to grossly distort what would actually happen to a jetliner were it to

impact the massively strong WTC towers:











42.    Another significant issue that this case might serve to find an answer to relates back to the Exhibit 6 compilation of witness statements.  Of the 500+ statements, at least 90 of them are redacted.  As the witnesses are civilians, it is highly questionable for statements that are in the nature of business records to be redacted.  Here are examples of the redacted statements from the larger grouping of them where the redactions occur in the same general area as do references to "plane":

D. McCORVEY          10

Q.  Where did you see them?

A.  West Street at West Street.

Q.  West Street and --

A.  West Street and -- I have no idea.
West Street. It was below Chelsea Piers, way
below Chelsea Piers.

Q.  Was it south of Canal, do you think?

A.  It was south of Canal.

Q.  On West south of Canal?

A.  Yeah. But I don't know names.

Q.  How close to the site?

A.  All I could see is a lot of smoke, so I
really don't know how close  was to the site.
Maybe Barclay Street? Maybe that far down,
Barclay Street?

Q.  Did they tell you they were coming from
the site?

A.  No, they didn't say that. We just went
up to the chief and told them that Janice was
under the building when the plane hit ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮. Then he said, "Well," to the captain,
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

D. McCORVEY          11



We couldn't get out of the city, so we ended up at NYU

Q.     ?

A.   Yeah.

We saw a couple of cops in the hospital. Actually we saw a lot of cops with injuries in the hospital, minor, not serious.

We went to Bellevue to gas up, and as we're gassing up we hear that loud rumble again. The three of us knew already to hide under the ambulance or go into the garage, because we didn't know what it was. We thought another building was going to come down or another jet was coming. But the fighter jets were flying over Manhattan. We're like, are they ours?

R. GOLDBACH

2

MR. RADENBERG:  Today's date is October 24,
2001.  I'm Paul Radenberg, Fire Department City of
New York.  The time is now 1047 hours.  Also
present is Assistant Commissioner James Drury.  We
are conducting an interview with Captain Ray
Goldbach, executive assistant to Commissioner Von
Essen.  This interview is being conducted at Fire
Department headquarters in relation to the events
of the morning of September 11, 2001.

Q.    Captain, for the record, would you identify
yourself?

A.    Captain Ray Goldbach, executive assistant to
the Fire Commissioner.

Q.    Captain, directing your attention back to
September 11, 2001, can you tell me what time you
became aware of a problem in Manhattan and where you
were when you became aware of it?

A.    I believe it was sometime between 8:30 and 9
o'clock.  And I was in my office.  I received a phone
call from Joe Higgins in communications, who told me
that a plane just went into the World Trade Center.
And they dumped the 1060, which is a radio signal for
a major emergency. ████████████

████████████████████████████

9

S. GOLDBACH

███████████████  But I walked back into my office, looked
out my window and I could see a plane had gone into the
north tower of the building.  With that I got Bill
Feehan.  He came into the office and took a look.  We
went and got Tom Fitzpatrick.  Tom Fitzpatrick came
over, came into my office, looked over and I had said
to him I believe a small plane went into the Trade
Center.  He said it's not a small plane.  It's a
commercial airline, look at the size of the hole.  I
couldn't see that far so I didn't know.

██████████████████████  The girls in our
office were all starting to cry already.  Tom McDonald,
Assistant Commissioner Tom McDonald, who was I believe
in a meeting with Tom Fitzpatrick, was there at the
same time.  I went down and got Peter Guidetti, the
office manager out of his office.  And the five of us
went down to the garage.  We all got into Bill's car.
We went up out of the building, we went down Jay to
Tillary, up Tillary and over the bridge.  The police
already had the bridge shut down.  We got over the
bridge pretty rapidly.  We went down around City Hall.
We got behind the police ESU truck that was on, I
believe it was Broadway, going downtown.  We followed

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. You couldn't
breathe because when the second plane hit, all
that debris, it was like cement. It just filled
up your throat, it filled up your lungs, you
could not breathe. You were actually spitting
out huge particles. It was like it manifested
itself in your mouth because it was so small and
it filled up. You couldn't breathe. It was just
caked in your throat.

My partner says, "All right. Listen,
stay with this unit." My unit was directly in
front. He said, "Stay with the unit, and I'm
going to go back." ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Maybe within -- I don't know really
time frame. I don't know time frame. But there
was a command or somebody had said the units had
to start moving. It wasn't that long after. I
was sitting in the back of one of the units, and
I don't remember what unit it was.

I said, you know what, I'm not going to
go with these units. I've got to go back. I've

L. SIEBUHR                          6

hum in the background, which people will probably
tell you different, but this is what I heard; and
then just a massive explosion, and that was loud,
because I was standing right underneath it when
the second plane had hit.

    My partner ran and grabbed me by my arm
and started yelling at me to run. So he was
actually holding onto me and making me run
quicker. Still I didn't know what was happening.
I didn't know it was a plane. I just thought it
was an explosion from the other tower. I didn't
know a plane had hit. So I'm pretty much
oblivious on what's really going on at this point
because everything is happening so fast.

    We ran and we got maybe less than a
quarter of a block, less than half a block,
maybe. I don't really remember. But I remember
we were still right there. Within minutes later,
over the radio or somebody had said, "Oh, my God,
the Pentagon got hit and this is war, we're at
war." ███████████████████████

███████████████████████

████████████████████████████████

███████████████████████████

43.    The above statements are from those referenced in fn 1. They all suggest that

information concerning "planes," possibly including information that casts doubt on the presence

of planes of some type or another, is being intentionally withheld

44.     Righteous indignation is one thing, evidence is another, redacted evidence raises additional concerns and inconsistencies within the evidence, raise other and further concerns that cry out for proper judicial resolution.  The plaintiff's approach to this case is properly supported by the demonstrated reliance upon, search for and questioning of the evidence.

45.     This affirmation, together with the affidavits of plaintiff, the exhibits annexed to it and the supporting affidavits accompanying plaintiff's affidavit, all combine to confirm that this case is not being presented for any improper purpose; the claims and other legal contentions are warranted by existing law, as articulated by the U.S. Supreme Court in <u>Rockwell Int'l Corp. v United States</u>, 127 S. Ct. 1397, 167 L. Ed. 2d 190, (2007), a case that some defendants herein did not cite and others misapplied and is being presented by a qui tam "original source."

46     Based upon all of the foregoing, the defendants' motions to dismiss must be denied in their entirety.


                                        Respectfully submitted,


                                         /s/ Jerry V. Leaphart
                                        Jerry V. Leaphart
                                Attorney for Plaintiff Dr. Morgan Reynolds


Dated: Danbury CT
        January 28, 2008